[No 36221. Department Two. January 31, 1963.]

KIETH G. ESBORG et al., Respondents, v. BAILEY DRUG COMPANY et al., Appellants.[*]

*Reported in 378 P. (2d) 298.

[1] In all fairness to the trial judge, it must be noted that another department of the superior court fixed the fees.

*Lycette, Diamond & Sylvester*, for appellants.

*Thomas A. Swayze, Jr.*, for respondents.

HAMILTON, J.—This is a products liability case. The defendants, Bailey Drug Company, the retailer, and Nestle-Lemur Company, the manufacturer, of the product involved, are appealing from an adverse judgment.

Trial of the action was had before the court, sitting without a jury. The appeal is upon a short record (Rule on Appeal 34 (3)), and contains only the testimony of the plaintiff wife (hereafter referred to as plaintiff) and two medical witnesses, one called by plaintiff and one by defendants.

The record before us does not indicate that pretrial interrogatories, and the answers thereto, contained in the transcript on appeal, were introduced in evidence, or otherwise considered by the trial court; hence, such may not be considered as evidence before us. *Mick v. American Dental Ass'n*, 49 N. J. Super. 262, 139 A. (2d) 570; 2A Barron and Holtzoff, Federal Practice & Procedure (Rules ed.) § 778, p. 390.

Plaintiff, a housewife, on December 30, 1959, purchased at defendant retailer's drugstore a hair tint preparation, produced by defendant manufacturer, marketed in a pressurized metal container, under the name of "Nestle Streak 'N' Tips." Plaintiff testified she voluntarily selected this product, from a display of hair tints, because of its price and her satisfaction from prior use of a product of defendant manufacturer.

The purpose of the tint, as stated upon the container, is "For Instant Touch-Ups"—"Covers New Growth"—"Adds Dramatic Accents, Streaks And Tips." Plaintiff used the product to retouch the front, back and sides of her hair, applying it according to the directions provided. The ingredients of the tint are not listed upon the container. A "patch test" for possible sensitivity is not specified, the only precaution, in this regard, being a printed statement at the conclusion of the directions stating: "A hypersensi-

tive person may experience an allergic scalp irritation from the use of this product. If you do, discontinue its use."

Three or four hours after use, plaintiff suffered a reaction, commencing with an itching sensation upon her scalp, culminating in a condition described by her as follows:

"I looked worse than any freak in a carnival, I swear. First of all, I couldn't see for a little peek out of one eye; my eyes were completely swollen shut. I didn't have any ears because my head was swollen, big knots all over my head and bumps, my ears were swollen, my neck was swollen where you couldn't tell whether I had ears or not. My lips were swollen so badly that I couldn't drink water and I remember my nose being straight across my face; in other words, I was just like a ball completely. . . . I didn't get any relief from the medicine the doctor prescribed. The swelling lasted, as I say, 3 or 4 days, and then after that when the swelling finally did go down I was in such a mess from the blotches all over my body from my head to the calves of my legs, I was nothing but a mass of blotches, blue, red, bumps. Instead of in my twenties, I looked at least in my sixties, to be perfectly honest. . . . All in all, the worst lasted around 10 days. . . ."

Plaintiff testified she had never previously been allergic to any substances, nor suffered any untoward reaction, although she had freely used various cosmetic preparations.

Plaintiff's doctor, who examined and prescribed for her, diagnosed her condition as contact dermatitis and inflammation of the skin. He further testified that, in his opinion, plaintiff was not a hypersensitive or allergic person, and that the cause of her condition was the content of the tint. He identified five of the six ingredients of the tint as "irritants" depending upon their concentration, and two, and possibly a third, as "sensitizers," one of which he suspected caused plaintiff's condition. He explained the difference between an irritant and a sensitizer as follows:

"Well, a sensitizer would probably, we find as things that would cause marked reactions in certain persons, much more liable to cause a severe reaction than in the average person; while an irritant would cause reaction essentially in the same degree in every person."

On further examination, plaintiff's doctor testified that contact dermatitis is an inflammation of the skin resulting from contact with a substance; that other areas of the body may become sympathetically irritated, which may be characterized as a sensitivity reaction; that it is not uncommon for a person's chemical make-up to change in the course of time, whereby such person may become hypersensitive or "sensitized" to a particular substance; that of the 10 cases of contact dermatitis he had treated in the past year, three or four had no previous history of allergy; and, that a substance is classified as a "sensitizer" after it has caused sensitivity in a sufficient number of persons to come to the attention of a number of doctors.

Defendants' doctor, who had not examined plaintiff, testified, in response to a hypothetical question, that a person displaying symptoms similar to those of plaintiff, by definition, suffered from a hypersensitivity, since more than a simple irritation was involved.

He further testified that none of the six ingredients of the tint could be characterized as "known sensitizers"; that five of the ingredients could be classified as irritants, categorizing one as possibly a "primary irritant," two as mild, and two only if used in 50 per cent or more concentration; and that a reaction, such as plaintiff's, to these ingredients would be rare and unique.

No evidence, furnished by either party, appears in the record before us, revealing the relative concentrations of the various chemical ingredients of the tint.

Plaintiff presented her case upon the theory of breach of an implied warranty, claiming neither negligence nor breach of express warranty.

Defendants affirmatively alleged allergy or hypersensitivity of the plaintiff as the cause of the reaction, and contend that, as a matter of law, there existed no implied warranties. No question of lack of privity between plaintiff and defendant manufacturer is raised.

The trial court found, *inter alia*: Some of the ingredients of the product were known irritants, causing some reaction in all persons if applied with sufficient strength; plaintiff

was not a hypersensitive person; plaintiff's reaction was caused by use of the product and the ingredients thereof; plaintiff's reaction was not caused by hypersensitivity, or failure to use necessary precautions; and the notice upon the container did not constitute a warning, but rather constituted an expression inviting trial and error use.

From the foregoing, and other findings, to which no error has been assigned, the trial court concluded defendants had impliedly warranted the merchantability of the product, and that such warranty had been breached.

Defendants assign error to the aforementioned findings and conclusions, to denial of defendants' motion for judgment notwithstanding the oral decision, and to entry of judgment.

In their briefs, defendants pursue their assignments of error along two main routes: (1) Under RCW 63.04.160 (Uniform Sales Act § 15) there is no applicable implied warranty; and (2), in any event, there can be no recovery by an allergic or hypersensitive buyer.

In approaching defendants' first assignment of error, it is necessary to bear in mind that we are confronted with two plaintiff-defendant relationships, one defendant being the retail-seller of the product, and the other the manufacturer.

RCW 63.04.160 applies to the relationship of buyer and seller. *Cochran v. McDonald,* 23 Wn. (2d) 348, 161 P. (2d) 305; *Williams v. S. H. Kress & Co.,* 48 Wn. (2d) 88, 291 P. (2d) 662. Implied warranties, if any, from manufacturer to consumer arise from the common law. *LaHue v. Coca Cola Bottling, Inc.,* 50 Wn. (2d) 645, 314 P. (2d) 421. In *Baum v. Murray,* 23 Wn. (2d) 890, 162 P. (2d) 801, as between buyer and seller, we held the Uniform Sales Act to be a codification of the common law, to be so applied whenever applicable.

RCW 63.04.160 (Uniform Sales Act § 15) provides in pertinent part:

"Subject to the provisions of this chapter and of any statute in that behalf, there is no implied warranty or condition as to the quality or fitness for any particular

purpose of goods supplied under a contract to sell or a sale, except as follows: (1) Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be reasonably fit for such purpose.

"(2) Where the goods are bought by description from a seller who deals in goods of that description (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be of merchantable quality.

" . . .

"(4) In the case of a contract to sell or a sale of a specified article under its patent or other trade name, there is no implied warranty as to its fitness for any particular purpose."

The trial court held defendants had breached an implied warranty of merchantability, imposed, so far as the defendant retail-seller be concerned, by RCW 63.04.160(2). Plaintiff does not here urge the applicability of subdivision (1). Defendants contend our decision in *Williams v. S. H. Kress & Co.*, *supra*, controls. Upon a factual pattern similar to the present case, we there said, speaking of RCW 63.04-.160(1), (2) and (4), as related to a buyer-retailer relationship [p. 93]:

"In the instant case, there is nothing in the record to indicate that Mrs. Williams, either directly or by implication, made known to the seller the particular purpose for which the mouthwash was required, nor that she relied upon the seller's skill or judgment. She merely went into the store, saw several bottles of Aseptisol on the shelf, and purchased a bottle. There was no implied warranty that it would be reasonably fit for the purpose for which she purchased it, and subdivision (1) does not apply.

"As to subdivision (2), the term 'bought by description' is confined to cases where the identification of the goods which are the subject-matter of the transaction depends upon the description. See *American Soda Fountain Co. v. Medford Grocery Co.*, 128 Oregon 83, 262 Pac. 939. This was not such a transaction.

"This was a sale of a specified article under its trade name, and came within the provisions of subdivision (4). Under it, there is no implied warranty as to its fitness for any particular purpose."

In the light of current, self-service marketing practices, we are not, in all respects, satisfied with the application of RCW 63.04.160(1) and (2) as propounded by the *Williams* case. We recognize there is reputable authority to the contrary. On the other hand, pause to hasty departure, from the *Williams* case, comes with recognition of the fact that the instant product, as well as many others of like nature, come to the retailer and consumer alike in sealed, inspection defying containers, frequently on the heels of national, demand-creating, advertising, and occasionally, as in the instant case, without a list of ingredients. They find their way to the shelves of a variety of multiproduct retailers. As a practical matter, it is doubtful that the average retailer stands in any better position, from the standpoint of evaluating their content, than the average consumer.

■ Suffice it to say, we have concluded that, where the evidence reveals no more than that the purchaser, relying upon the manufacturer's reputation, voluntarily selects from the retailer's shelf, a brand-name product, other than food, sealed in a container, such transaction does not fall into the ambit of RCW 63.04.160(1) and (2).

The trial court erred in granting judgment against the defendant retailer.

As heretofore indicated, implied warranties of fitness and merchantability by a manufacturer, where found in the absence of privity, arise from the common law. *LaHue v. Coca Cola Bottling, Inc., supra.* We have, since the time of *Mazetti v. Armour & Co.*, 75 Wash. 622, 135 Pac. 633 (1913), imposed upon manufacturers of food products common-law implied warranties of merchantability and fitness despite lack of privity.

■ In *Ringstad v. I. Magnin & Co.*, 39 Wn. (2d) 923, 239 P. (2d) 848, we applied an implied warranty of fitness for purpose (RCW 63.04.160(1)) to a retail sale of clothing, one of the premises being that no sound distinction could

be drawn between a harmful product taken internally, *i.e.*, food, and wearing apparel meant to be worn next to the skin. By the same token, it would appear to us, no such distinction could be drawn as to a cosmetic intended to be applied to the hair, scalp, or skin.

We conclude the trial court did not err in imposing a common-law implied warranty of merchantability upon defendant manufacturer.

Defendants' second contention is predicated upon the premise that plaintiff was allergic or hypersensitive to an ingredient contained in the product, which condition constituted the cause of plaintiff's reaction.

Consideration of this contention presents a question of first impression in this state.

A reading of the evidence presented in the record before us, indicates that plaintiff introduced substantial evidence, which, if accepted, together with the reasonable inferences therefrom, would support the following factual conclusions: (1) Plaintiff purchased and used the product for the purpose and in the manner intended; (2) plaintiff had theretofore never suffered an allergic or hypersensitive reaction, although she had used similar products for similar purposes, including on one occasion a product of defendant manufacturer; (3) plaintiff was not a hypersensitive person, or, unbeknown to her, had become hypersensitive or allergic to a chemical substance; (4) the ingredients of the product consisted of irritants, two and possibly three of which were known sensitizers; and (5) plaintiff's reaction was caused by a component or components of the product.

We agree with defendants that the finding of the trial court, upon the record before us, that plaintiff's reaction *was not* hypersensitive or allergic lacks substantial evidentiary support.

On the other hand, from the defendants' point of view, there is substantial evidence which, together with the reasonable inferences therefrom, would, if accepted, support findings to the effect: (1) None of the product's ingredients were sensitizers, being irritants only; (2) such ingredients were not uncommon to similar products and are normally

harmless; (3) plaintiff is a hypersensitive person, and such caused her reaction.

■ Of the two factual patterns permissible under the evidence before us, the trier of the fact accepted the one favorable to the plaintiff. Such choice will not be disturbed upon appeal.

There is substantial evidence, which, together with the reasonable inferences therefrom, would support a finding: (a) that plaintiff's reaction to the ingredients is not an uncommon one, or, (b) plaintiff's reaction to the ingredients was unique, isolated or peculiar to her. Neither finding was made by the trial court.

In the legal field we now find ourselves, that is allergy and product liability, it appears there are two gates, represented by seemingly divergent, although not wholly irreconcilable lines of authority.[1] They may be defined by a quotation from *Crotty v. Shartenberg's-New Haven, Inc.*, 147 Conn. 460, 464, 162 A. (2d) 513:

" . . . Some jurisdictions hold that if the article sold can be used by a normal person without injury, there is no breach of the implied warranty of reasonable fitness. *Flynn v. Bedell Co.*, 242 Mass. 450, 453, 136 N. E. 252; *Worley v. Proctor & Gamble Mfg. Co.*, 241 Mo. App. 1114, 1122, 253 S. W. 2d 532; *Barrett v. S. S. Kresge Co.*, 144 Pa. Super. 516, 522, 19 A.2d 502; *Stanton v. Sears Roebuck & Co.*, 312 Ill. App 496, 500, 38 N.E.2d 801; *Zager v. F. W. Woolworth Co.*, 30 Cal. App. 2d 324, 332, 86 P.2d 389; *Merrill v. Beaute Vues Corporation*, 235 F.2d 893, 898; *Graham v. Jordan Marsh Co.*, 319 Mass. 690, 693, 67 N.E.2d 404. In some of these cases, the injured party was described as one who suffered from a peculiar or unique susceptibility to harm from the article or product sold; in others, he was found to have a peculiar sensitivity or unusual bodily condition unknown to the seller. In none of them was he one of an appreciable class of like persons. In other cases, the courts have held that protection to the buyer cannot be logically restricted,

---

[1]See 26 A. L. R. (2d) 958, 963; 2 Hursh, Am. Law of Products Liability, chapter 8, p. 41; Freedman, Allergy and Products Liability; 2 Frumer & Friedman, Products Liability, chapter 8, p. 1; 1 Current Medicine For Attorney's No. 4, p. 10 (1954); 10 Brooklyn L. Rev. 363; 25 Fordham L. Rev. 306; 24 So. Cal. L. Rev. 221; 49 Mich. L. Rev. 253; 35 Conn. Bar Jour. 95; 46 Connell L. Q. 465.

under a breach of warranty, to a predetermined, arbitrary class such as the normal buyer. *Bianchi v. Denholm & McKay Co.*, 302 Mass. 469, 472, 19 N.E.2d 697; *Zirpola v. Adam Hat Stores, Inc.*, 122 N.J.L. 21, 22, 4 A.2d 73; *Reynolds v. Sun Ray Drug Co.*, 135 N.J.L. 475, 476, 52 A.2d 666. These courts adopt the theory that the seller is not absolved from liability under the implied warranty created by the statute by the mere fact that only a small proportion of those who use the product suffer injuries because of its use. In each of these cases, the plaintiff was found to be one of a class of persons whose bodily conditions made him susceptible to injury upon exposure to a substance which would cause harm only to persons in that class."

A critical analysis of the lines of decision referred to in the *Crotty* case, leads us to the conclusion, not infrequently expressed by other writers in the field, that the so-called majority and minority views are, upon their facts, at least, reconcilable. The first cited cases, representative of the majority, arrive at their denial of liability upon the factual premise that the plaintiff before them was, under the evidence presented, peculiarly unique in susceptibility to the content of the product involved, and was not representative of any definable or significant group of consumers. The second line of cited authorities accord liability, upon the basis of the facts before them indicating the complainant to be a member of an identifiable and significant class or number of consumers, composed of the innocently allergic.

As expressed in 1 Williston on Sales (Rev. ed.) § 243, p. 643: " . . . The problem is evidently one of degree, where the buyer's sensitiveness is not disclosed to the seller."

 We are satisfied that, in the light of modern scientific, technological, and medical advances, allergic phenomena constitutes a factor which any prudent manufacturer of cosmetic, food, drug or dye products necessarily must consider. When, therefore, a manufacturer produces, and distributes, a product containing scientifically or medically known chemical sensitizers, primary irritants or irritants in sensitizing concentrations, such manufacturer either takes a calculated risk that the number of persons

likely to be affected is negligible, or his scientific research so indicates. In either event, it is difficult to understand why he should not impliedly warrant the merchantability and fitness for use of his product.

On the other hand, it would appear reasonable to require of a plaintiff, seeking to establish a breach of such warranties, when confronted with the defense of allergy or hypersensitivity, that such plaintiff produce substantial evidence which, with the reasonable inferences therefrom, will support findings that: (a) the product involved contains a harmful ingredient; (b) such ingredient is harmful to a reasonably foreseeable and appreciable class or number of potential users of the product; and (c) plaintiff has been innocently injured in the use of the product in the manner and for the purpose intended.

What constitutes, in a given case, a reasonably foreseeable and appreciable class or number of potential users, is incapable of precise or quantitative definition. In the absence of proof to the contrary, upon which the minds of reasonable men could not differ, it would appear to present a question of fact for the trier of the facts, bearing in mind the usual and ordinarily accepted meanings of the words employed.

We have, within the framework of this case, limited our consideration to synthetic products. We do not, in any sense, undertake to pass upon legal consequences relating to the production and distribution of natural products. Neither do we here pass upon the effectiveness of adequate warning notices, pretesting requirements, or disclaimers printed upon products.

As we have hereinabove indicated, the trial court did not make and enter a finding upon the issue of whether or not the ingredients of the product here involved are harmful to a reasonably foreseeable and appreciable class or number of potential users.

Accordingly, the cause will be remanded to the trial court for the entry of a finding of fact upon such issue, based upon the evidence heretofore presented. If such finding be favorable to plaintiff, she will be entitled to recover. If

not, defendant manufacturer will be entitled to judgment of dismissal. *Garratt v. Dailey,* 46 Wn. (2d) 197, 279 P. (2d) 1091.

Defendant retailer is entitled to its costs. Costs between plaintiff and defendant manufacturer will abide the ultimate decision of the trial court.

The cause is so remanded.

OTT, C. J., DONWORTH, FINLEY, and HUNTER, JJ., concur.