**Robert D. PUTMAN, Appellant,**

v.

**ERIE CITY MANUFACTURING COMPANY et al., Appellees.**

No. 20282.

United States Court of Appeals
Fifth Circuit.

Nov. 30, 1964.

Joyce Hill, A. W. Salyars, Lubbock, Tex., for appellant.

J. Orville Smith and Crenshaw, Dupree & Milam, Lubbock, Tex., for appellees.

Before BROWN, WISDOM and BELL, Circuit Judges.

WISDOM, Circuit Judge:

■■ Once again Erie [1] thrusts the Court into the field of products liability.[2] Once again state guidelines are hard to find and follow. Jacob E. Decker & Sons, Inc. v. Capps, 1942, 139 Tex. 609, 164 S.W.2d 828, 142 A.L.R. 1479, a case of national importance, firmly settled the law of Texas that in a food case privity of contract is not a prerequisite to recovery for breach of a manufacturer's warranty of fitness for human consumption; the warranty is implied by law as a matter of public policy. But the Supreme Court of Texas has not committed itself to a position on the necessity for privity as a prerequisite to recovery in non-food cases. In the case before the court the defective product is a wheel chair. Making an Erie educated guess,

we hold: Today, the Supreme Court of Texas would follow Decker to its logical conclusion and rule that a manufacturer or assembler of a defective product, unreasonably dangerous to the user, is subject to strict liability to the user for an injury caused by the defect, even though the product is not a food for human consumption, there is no proof of negligence, and there is no privity between the user and the manufacturer or assembler.

January 4, 1962, Robert Putman, the plaintiff-appellant, was sitting in a wheel chair, each leg immobilized in a cast as a result of his having broken both legs in an automobile accident three weeks before. As he started to roll the chair, a wheel came off throwing Putman to the floor. In the fall Putman broke both legs at the old breaks. The chair collapsed because of a defective fork stem connecting the wheel to the chair. Faultless Castor Corporation, an Indiana corporation, manufactured the fork stem and supplied it to Erie City Manufacturing Company, a Pennsylvania corporation. Erie City assembled the chair, without changing the fork stem, and sold the completed wheel chair to a retail druggist who, in turn, rented it to Putman, a resident of Lubbock, Texas. The complaint charges the defendants, Faultless Castor and Erie City, with both negligence and breach of implied warranties of fitness and merchantability. The district court granted the defendants' motion to strike the pleadings on implied warranties on the ground that there was no privity of contract between the plaintiff and the defendants. The case was tried therefore on the issue of negligence. The jury, in answers to special interrogatories, fixed the plaintiff's damages at $1,500, but found the defendants free from negligence. Accordingly,

1. Erie R. R. Co. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188.

2. See Necaise v. Chrysler Corporation, 5 Cir. 1964, 335 F.2d 562; Lartigue v. R. J. Reynolds Tobacco Co., 5 Cir. 1963, 317 F.2d 19; Grey v. Hayes-Sammons Chemical Co., 5 Cir. 1962, 310 F.2d 291; Green v. American Tobacco Co., 1963, Fla., 154 So.2d 169, answering certified question 5 Cir. 1962, 304 F.2d 70; R. J. Reynolds Tobacco Company v. Hudson, 5 Cir. 1963, 314 F.2d 776; Gladiola Biscuit Co. v. Southern Ice Co., 5 Cir. 1959, 267 F.2d 138; Arnaud's Restaurant, Inc. v. Cotter, 5 Cir. 1954, 212 F.2d 883, cert. den'd 348 U.S. 915, 75 S.Ct. 295, 99 L.Ed. 717.

the district court overruled the plaintiff's motion for judgment and entered judgment for the defendants. We reverse.

In 1952, eight years before the New Jersey Supreme Court decided Henningsen v. Bloomfield Motors, Inc.,[3] Judge W. H. Atwell, Federal District Judge in the Northern District of Texas, referred to the Texas public policy, expressed in Decker, of imposing strict liability on the manufacturer, as "italicized" in the food cases. He made this discerning comment:

> "It may not be out of place to observe that a nation with a hundred and fifty million people who own millions of motor cars, should be protected by the same public policy that protects the user of deleterious food."[4]

In Henningsen, characterized by Dean Keeton[5] as "one of the most significant cases since MacPherson v. Buick Motor Co.",[6] the court, quoting extensively from Decker, could "see no rational doctrinal basis for differentiating between a fly in a bottle of beverage and a defective automobile". Sitting as an Erie court in Texas, and also relying on the reasoning in Decker, we see no rational doctrinal difference to justify any distinction between an upset stomach caused by a fly in a coke and a broken leg caused by a weak axle of a wheel chair.

## I.

The starting point for our discussion of the Texas cases is, of course, Chief Justice Alexander's opinion in Decker. In that case an ultimate consumer brought an action for injuries to herself, her husband, and other members of her family caused by their having eaten unwholesome sausage manufactured by the Decker Company. The plaintiff did not allege negligence and there was no privity between the parties; Decker Company sold the sausage in a sealed container to a retail grocer who sold it to the plaintiff. The Texas Supreme Court allowed an action for breach of an implied warranty of fitness, basing its holding on the public policy of protecting consumers from unwholesome food and the recognition of the fact that a warranty of fitness is meaningless unless it inures to the benefit of the person who will consume the product. The court took pains to point out that historically the action was in tort;[7] that the "warranty" was based on public policy, rather than on any notion of the implied warranty as the obligation of a contract or as a contract for the benefit of a third party beneficiary:[8]

> "While a right of action on such a case is said to spring from 'warranty,' it should be noted that the warranty here referred to is not the

---

3. Henningsen v. Bloomfield Motors, Inc., 1960, 32 N.J. 358, 161 A.2d 69, 75 A.L.R. 2d 1.

4. Bowerman v. Goodyear Tire & Rubber Co., N.D.Tex.1952, 105 F.Supp. 119 (dictum).

5. Keeton, Products Liability-Current Developments, 40 Tex.L.Rev. 193, 207 (1961).

6. MacPherson v. Buick Motor Co., 1916, 217 N.Y. 382, 111 N.E. 1050, L.R.A. 1916F, 696.

7. Dean Prosser has discussed this at length in The Implied Warranty of Merchantable Quality, 27 Minn.L.Rev. 117 (1943) and The Assault Upon the Citadel (Strict Liability to the Consumer), 69 Yale L.J. 1099, 1126 (1960). For an earlier treatment of the subject, see Ames, History of Assumpsit, 2 Harv.L.Rev. 1 (1888). For recent discussions, see McCurdy, Warranty Privity in Sale of Goods, 1 Houston L.Rev. 201 (1964). Murray, Implied Warranty Against Latent Defects: An Historical Comparative Law Study, 26 Ins.L.J. 547 (1961).

8. "Although the courts are occasionally confused about the matter, warranty [unlike negligence which is a tort concept based on fault] is not a concept based on fault or on the failure to exercise reasonable care. But this does *not* mean that warranty is necessarily contractual or non-tortious in nature. Liability in warranty arises where damage is caused by the failure of a product to measure up to express or implied representations on the part of the manufacturer or other supplier. Accordingly, an injured person is not required to prove negligence in a warranty-products liability case." Frumer and Friedman § 16A p. 358.

more modern contractual warranty, but is an obligation imposed by law to protect public health. * * * The doctrine of privity of contract and of the necessity therefor in order to sustain an action grew out of the later action of assumpsit. It [applied] only when one is seeking to enforce a contract. *Here the liability of the manufacturer and vendor is imposed by operation of law as a matter of public policy for the protection of the public, and is not dependent on any provision of the contract, either express or implied."* (Emphasis supplied.) 164 S.W.2d 831.

It is true that Decker involved food for human consumption. It is true that Justice Alexander cited ancient statutes and ordinances showing the special stringency of food regulations, and that the court expressed its holding in terms of an exception to the general rule. But the

rationale for the decision, as the court made clear, is the "broad principle of the public policy to protect human health and life". This policy, as was soon evident in other states, cannot be confined to injuries from food.[9] In support of this "broad principle", the Texas Supreme Court presented reasons for strict liability that would be applicable to many kinds of products and is especially applicable in the case before us: the consumer is often unable to inspect or to analyze the product and often must rely on the manufacturer's representations of quality and fitness, made through advertising, packaging or trademarks; the manufacturer or assembler placing its product in the market place should bear, with its greater capacity to spread the cost, the burden of society's desire to protect the public from injury.[10]

■ The manufacturer or assembler of a wheel chair knows that it is a medical appliance for a class of users re-

9. "Perhaps such a limitation corresponds to the reasonable expectations of commercial buyers and sellers when they are concerned with trade losses. But where commodities are dangerous to life and health society's interest transcends that of protecting reasonable business expectations. It extends to minimizing the dangers to consumers and putting the burden of their losses on those who best can minimize the danger and distribute equitably the losses that do occur. * * * No valid reason appears for distinguishing between food cases and others so far as the privity requirement is concerned." Fleming, Products Liability, 34 Texas Law Review, 192, 193, 196 (1955).

10. Dean Prosser summarizes the policy argument as follows: 1. "The public interest in human life and safety demands the maximum possible protection that the law can give against dangerous defects in products which consumers must buy, and against which they are helpless to protect themselves; and it justifies the imposition, upon all suppliers of such products, of full responsibility for the harm they cause, even though the supplier has done his best. This argument, which in the last analysis rests upon public sentiment, has had its greatest force in the cases of food, where there was once popular outcry against an evil industry, injuries and actions have multiplied, and

public feeling is most obvious. It is now being advanced as to other products, such as automobiles. 2. The maker, by placing the goods upon the market, represents to the public that they are suitable and safe for use; and by packaging, advertizing or otherwise, he does everything that he can to induce that belief. He intends and expects that the product will be purchased and used in reliance upon this assurance of safety; and it is in fact so purchased and used. The middleman is no more than a conduit, a mere mechanical device, through whom the thing sold is to reach the ultimate user. The supplier has invited and solicited the use; and when it leads to disaster, he should not be permitted to avoid the responsibility by saying that he has made no contract with the consumer. 3. It is already possible to enenforce strict liability by resort to a series of actions, in which the retailer is first held liable on a warranty to his purchaser, and indemnity on a warranty is then sought successively from other suppliers, until the manufacturer finally pays the damages, with the added costs of repeated litigation. This is an expensive, time-consuming, and wasteful process, and it may be interrupted by insolvency, lack of jurisdiction, disclaimers, or the statute of limitations, anywhere along the line." Prosser, Law of Torts § 97, p. 673 (3d Ed. 1964).

quiring special protection—the old, the infirm, the crippled. Such persons would seem to have as much of a claim to protection externally as those who are entitled to protection internally because of their consumption of drugs and medicines. If the Decker doctrine extends beyond food products, and we think that it does, a wheel chair case is an *a fortiori* case for holding a manufacturer and assembler strictly liable to a user.

The Decker doctrine, even if originally confined to food for human consumption, has burst its bonds. For example, the Henningsen court supported its far-reaching decision with long quotations from Decker in imposing strict liability on the manufacturer of an automobile with a defective steering wheel. Dean Prosser cites the Decker opinion as "perhaps the best over-all statement" of the reasons why sellers of chattels generally should be held strictly liable to ultimate consumers and users.[11]

Turning now to Texas cases since Decker, we find cross-currents, especially in the decisions of the Courts of Civil Appeals, but a general trend toward relaxing the requirement of privity.

The day Decker was decided, the Texas Supreme Court decided Griggs Canning Co. v. Josey, 1942, 139 Tex. 623, 164 S.W. 2d 835, 142 A.L.R. 1424, extending the same strict liability to retailers as to manufacturers. In Bowman Biscuit Co. of Texas v. Hines, 1952, 151 Tex. 370, 251 S.W.2d 153, however, a majority of the court declined to extend the doctrine to a wholesaler who simply passes on to a retailer a product in a sealed package, and expressed doubt as to retailer's liability. Justice Garwood, joined by others, in a strong dissent approved the Griggs doctrine of retailer liability and argued that wholesaler liability was a logical corollary. This Court has said: "We see nothing in Bowman to detract from Decker. Nor does it, standing alone, or in conjunction with decisions of the Courts of Civil Appeals, reveal a

purpose to retract or constrict the philosophy which Decker set forth". Gladiola Biscuit Co. v. Southern Ice Co., 5 Cir. 1959, 267 F.2d 138, 139.

Five food cases have followed the Decker holding. Coca-Cola Bottling Co. v. Burgess, Tex.Civ.App. 1946, 195 S.W. 2d 379; Amarillo Coca-Cola Bottling Co. v. Loudder, Tex.Civ.App. 1947, 207 S.W. 2d 632; Sweeney v. Cain, Tex.Civ.App. 1951, 243 S.W.2d 874 (no writ history); Campbell Soup Co. v. Ryan, Tex. Civ.App. 1959, 328 S.W.2d 821; Athens Canning Co. v. Ballard, Tex.Civ.App. 1963, 365 S.W.2d 369. In three cases involving exploding bottles the Courts of Civil Appeals denied recovery on the ground that the social policy of protecting the consumer did not apply to protection from a defective bottle. Jax Beer Co. v. Schaeffer, 1943, Tex.Civ. App., 173 S.W.2d 285; Latham v. Coca-Cola Bottling Co., 1943, Tex.Civ.App., 175 S.W.2d 426; Anheuser-Busch Inc. v. Butler, 1944, Tex.Civ.App., 180 S.W.2d 996 (no writ history). In Burgess the court noted that the defendant was a wholesaler, although the court based its holding on the fact that it was the bottle, not the beer, that was defective. In Latham the decision rested on the fact that the bottling company did not manufacture the bottle. In Butler, however, the court said that it was immaterial whether the defendant was a wholesaler or manufacturer; the implied warranty does not cover "damages arising out of defective containers of food where the injury inflicted was not caused by the consumption of the food".

In International Milling Co. v. Jernigan, 1945, 191 S.W.2d 526, the Waco Court of Civil Appeals applied the Decker doctrine to a sale of bran sold as feed for hogs. It does not appear that the court found any magical quality in the fact that the product was a *food* for hogs; the injury was to the property of the plaintiff. The case represents an extension of strict liability to a situation involving property damage caused

11. Prosser, Law of Torts, § 97, p. 673 (3d Ed. 1964).

by a product not intended for human consumption.

The appellees assert that Brown v. Howard, 1955, 285 S.W.2d 752, ref. nre., correctly states the law of Texas in a non-food case. In Brown v. Howard the San Antonio Court of Civil Appeals declined to apply the strict liability doctrine to an injury caused to Brahman cattle by the use of an insecticide. In that case, however, apparently the plaintiff attempted to recover consequential damages for breach of an implied *contractual* warranty. On the facts, Brown v. Howard is not what is usually thought of as a products liability case: the product did not contain a defective condition or dangerous element unknown to the user. The label on the container expressly stated the chemical composition of the concentrate, showing 26.5 per cent D.D.T. and 24.5 per cent chlordane. When mixed with water in the proper proportion, the solution was an effective cattle spray. The plaintiff added water to the concentrate in the proper proportion—so he alleges—but unfortunately for him, Brahmans, because of having sweat glands in their skin, are more susceptible to D.D.T. and chlordane poisoning than are other species of cattle. As a result, some of the plaintiff's cattle died. Judge Brown brushed off Brown v. Howard—correctly, we think:

> "[The product] was insecticide designed to kill. Eaten by a cow it did just that, and the Court holds that there was no liability." Gladiola Biscuit Co. v. Southern Ice Co., 5 Cir. 1959, 267 F.2d 138.

Finally, we note that in Texas the requirement of privity is inapplicable in cases involving injury by "imminently" dangerous products, that is, products which are not inherently dangerous when properly constructed. International Derrick & Equipment Co. v. Croix, 5 Cir. 1957, 241 F.2d 216, cert. den'd, 354 U.S. 910, 77 S.Ct. 1296, 1 L.Ed.2d 1428; 74 A.L.R.2d 1224; Roosth & Genecov Production Co. v. White, 1953, 152 Tex. 619, 262 S.W.2d 99. "There is no longer any basis for doubt that [in Texas] a manufacturer may be liable to third persons who have no contractual relations with him for injury resulting from defects in his product which could have been avoided by the manufacturer's exercise of due care." Dement v. Olin-Mathieson Chemical Corporation, 5 Cir. 1960, 282 F.2d 76. This principle represents abandonment of privity in line with MacPherson v. Buick Motor Co., 1916, 217 N.Y. 382, 111 N.E. 1050. In Ford Motor Company v. Mathis, 5 Cir. 1963, 322 F.2d 267, this court, using the language of Decker-Henningsen, expressed the belief that the Supreme Court of Texas will not "differentiate between a Texan felled by a microbe and one killed by a negligently defective machine hurtling through space at great, but expected, speed." 322 F.2d at 276. See also Standard Motor Company v. Blood, Tex.Civ.App. 1964, 380 S.W.2d 651.

In Ford Motor Co. v. Mathis this Court held an assembler-manufacturer liable for the negligence of an independent supplier although the defect could not have been discovered by reasonable inspection by the manufacturer-assembler. The decision relied on Restatement, Torts, Section 400: "One who puts out as his own product a chattel manufactured by another is subject to the same liability as though he were its manufacturer." The Court relied also on Section 395 of the Restatement imposing liability upon a manufacturer-supplier for failing to use due care in the manufacture of a chattel which will, unless carefully made, cause an unreasonable risk of injury to those who use it. Here, it is not clear from the record whether the defect in the fork stem was discoverable but, assuming that the jury's finding that there was no negligence disposed of that possibility, the parallel with the instant case is apparent. Putman's wheel chair with a defective fork stem is like Mathis's automobile with a defective dimmer switch. Both might be said to come within the imminently dangerous doctrine. See Note, 18 S.W.L.J. 128 (1964). In Mathis, however, the Court

found as we do in this case, that the proper application of Texas law required resort to the public policy argument—liability through operation of law for putting in the stream of commerce an unreasonably dangerous product.

In the most recent study of Texas cases on products liability, the author writes:

> "[A]s late as the year 1960, when 74 ALR 2d was published * * * it is stated on page 1224 that apparrently the old rule of requiring privity of contract is still in effect in Texas, although it is also said that the Texas courts view the requirement as inapplicable in cases involving inherently or imminently dangerous products or unwholesome food products. As we shall see, *the requirement has now just about been entirely abandoned.*" (Emphasis supplied.) Bateman, Products Liability, 27 Texas Bar Journal 9, 41 (1964).

That conclusion was anticipated in 1960 by a federal district court in New York. In Siegel v. Braniff Airways Inc., S.D. N.Y. 1960, 204 F.Supp. 861, under New York conflicts of law principles, the court applied the substantive law of Texas to a claim for breach of implied warranty. Judge Levet reviewed the Texas decisions, relying strongly on "[t]he Decker case, supra, and other cases cited herein [indicating] that the *definite and persuasive trend is toward the abrogation of this anachronism*" of retaining privity in a breach of warranty case. 204

F.Supp. at 864. He too could see no valid reason for distinguishing between food cases and other cases and he pointed out that modern legal writers, almost without exception, have observed and favored the trend toward abandoning the requirement of privity. Judge Levet held:

> "*In view of the evident trend in the State of Texas and elsewhere,* I am inclined to conclude that the Supreme Court of Texas would not apply the requirement of privity to the causes of action or claims which are attacked by this motion." (Emphasis supplied.) 204 F.Supp. at 865.

## II.

The case before us presents the type of situation Judge Clark has described as "the most troublesome, the most unsatisfying in its consequences" of all the situations in which Erie requires a federal court to ascertain state law.[12] Here, although the trend in Texas may be as evident as Judge Levet found it to be, there is no decision of the Texas Supreme Court on the question at issue. The Court is forced, therefore, to look to "all available data";[13] for example, "to such sources as the Restatements of Law, treatises and law review commentary, and the majority rule", keeping in mind that it must "choose the rule which it believes the state court, from all that is known about its methods of reaching decisions is likely in the future to adopt."[14] Professor

---

12. Clark, State Law in the Federal Courts: The Brooding Omnipresence of Erie R. R. Co. v. Tompkins, 55 Yale L.Jour. 267, 290 (1946).

13. West v. American Telephone & Telegraph Co., 1940, 311 U.S. 223, 61 S.Ct. 179, 85 L.Ed. 139.

14. Wright, Federal Courts, § 58, p. 206. See I Barron & Holtzoff (Wright ed.) § 8; Hart & Wechsler, The Federal Courts and the Federal System, pp. 628–30; and Hart, The Relations between State and Federal Law, 54 Col.L.Rev. 489 (1954) in which Professor Hart observed (at 510) "If federal courts, in the exposition of state law, are not to

have the freedom, at least of the state courts immediately inferior to the state's highest court, federal justice is doomed to be second-rate justice, and the state systems will lose the benefit of valuable contributions to their growth." See also Fitzgerald, The Celebrated Case of Daily v. Parker, 15 U.Kan.City L.Rev. 120 (1947); Note, How a Federal Court Determines State Law, 59 Harv.L.Rev. 1299 (1946). And see Friendly, In Praise of Erie, 39 N.Y.U.L.Rev. 383, 400 (1964) in which Judge Friendly noted that Bernhardt v. Polygraphic Co. of America, 1956, 350 U.S. 198, 76 S.Ct. 273, 100 L.Ed. 199 "was a marked advance" over such cases as Fidelity Union Trust Co.

Corbin's ringing language of two decades ago is good advice to Erie courts today:

"When the rights of a litigant are dependent on the law of a particular state, *the court of the forum must do its best (not its worst) to determine what that law is*. It must use its judicial brains, not a pair of scissors and a paste pot. Our judicial process is not mere syllogistic deduction, except at its worst. At its best, it is the wise and experienced use of many sources in combination—statutes, judicial opinions, treatises, prevailing mores, custom, business practices; it is history and economics and sociology, and logic, both inductive and deductive. Shall a litigant, by the accident of diversity of jurisdiction, be deprived of the advantages of this judicial process? * * * It is in fact a denial of justice to those for whom a court exists. We must not forget that a litigant has only one day in court. When forced into a federal court, that is his only court. If he is denied life, liberty, or property by the narrow syllogistic use of a state judge's worded doctrine, he is not restored by the fact that intelligent state judges later refuse to apply that doctrine to other litigants. True, he has had his day in court; but what a court!" (Emphasis supplied.) Corbin, The Laws of the Several States, 50 Yale L.J. 762, 775 (1941).[15]

The evolutionary progress of Section 402A of the American Law Institute's revised Restatement of the Law of Torts, now about to be published as Restatement, Second, Law of Torts, supplies dramatic evidence of the rapid movement, throughout the states, toward imposition of strict liability on the seller to the user for injury caused by defective goods, regardless of their character. The original Restatement of Torts had no provision for strict liability based on a seller's implied warranty. In April 1961, Tentative Draft No. 6 of the Restatement, Second, recommended adoption of a new section, Section 402A. This section recognized the seller's strict liability but limited liability to claims for "food for human consumption". By April 1962 it had become apparent that "food for human consumption" was too narrow a category. Tentative Draft No. 7 expanded the coverage of the section to include "products intended for intimate bodily use", "whether or not [they] ha[ve] any nutritional value".[16] A com-

---

v. Field, 1940, 311 U.S. 169, 61 S.Ct. 176, 85 L.Ed. 109 and West v. American Tel. & Tel. Co., 1940, 311 U.S. 223, 61 S.Ct. 179, 85 L.Ed. 139. "Mr. Justice Frankfurter's concurrence seems altogether to fit Corbin's view as to the duties of federal courts in 'finding' state law. If some federal judges have been slow to learn the lesson, it is not the Supreme Court, much less Mr. Justice Brandeis, that is to blame". 39 N.Y.U.L.Rev. at 400. Judge Friendly cites the following examples of the current approach: Daily v. Parker, 7 Cir. 1945, 152 F.2d 174, 162 A.L.R. 819; Evans v. S. J. Groves & Sons, Co., 2 Cir. 1963, 315 F.2d 335; Essex Universal Corp. v. Yates, 2 Cir. 1962, 305 F.2d 572; Strubbe v. Sonnenschein, 2 Cir. 1962, 299 F.2d 185, 188–189, 97 A.L.R.2d 1386.

15. See also Corbin, The Common Law of the United States, 47 Yale L.J. 1351 (1938).

16. The Reporter's comments in Tentative Draft No. 7 show that the term is given a broad meaning: "Products intended for intimate bodily use, as that phrase is used in this Section, include all food and drink, and everything intended for internal human consumption, whether or not it has nutritional value. Thus the term includes candy, chewing gum or chewing tobacco, snuff, cigarettes, and all raw materials, such as unground coffee, from which the consumer or some intermediate party is expected to prepare food or drink ultimately to be consumed. It includes drugs which are to be taken internally, and such an article as a surgical pin for setting bone fractures, which is to be incorporated inside of the body. 'Intimate bodily use' also includes products intended for external application or contact with the human body, where such application or contact is of an 'intimate' character. This does not mean that everything which may be expected to come in contact with the person is to be included. A nail is-

ment explained that "intimate bodily use" also included "products intended for external application or contact" where it was "of an intimate character". In two years even this greatly broadened version was obsolete. In May 1964, the Institute approved the final draft of Section 402A making the rule applicable to all products. This section provides:

"§ 402A. Special Liability of Seller of Products for Physical Harm to User or Consumer.

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property, is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

"(a) the seller is engaged in the business of selling such a product, and

"(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

"(2) The rule stated in subsection (1) applies although

"(a) the seller has exercised all possible care in the preparation and sale of his product, and

"(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

The Reporter for the Restatement, Second, Dean Prosser,[17] explained the change as follows:

"This Section was approved, in Tentative Draft No. 7, at the meeting in 1962. Expanded Comments were subsequently considered and approved. Since 1962 there have been so many decisions extending the strict liability beyond products 'for intimate bodily use,' that it has become quite evident that this is the law of the immediate future. If this Section is to be published this summer, in Volume II of the Restatement, [as approved in Tentative Draft No. 7] it will already be on the point of becoming dated. With the exception of the change in the law with respect to prenatal injuries, this is the most radical and spectacular development in tort law during this century."

Since 1958,[18] almost every court that has considered the question has expanded the doctrine of strict liability to cover all defective products, regardless of lack of proof of negligence.[19] Part of the impetus has come from an almost

---

not intended for intimate bodily use, merely because the user may be expected to hold it in his fingers while he drives it with a hammer. On the other hand, products such as clothing, intended to have close and continued contact with the body, are for intimate bodily use. So are soap and cosmetics, liniments or other medical preparations for external application, hair dye, solutions for imparting a permanent wave to the hair, and similar products intended to affect in some manner the body itself. In determining whether a product is for intimate bodily use, the question is one of whether it is intended for a purpose which involves long continued contact with the person, or such close and personal contact or application, even in a single instance, that the ordinary man would recognize that something more than a casual touching, some thing amounting to an intimate approach to his person, is involved." The

American Law Institute, Restatement of the Law Second, Torts, Tentative Draft No. 7, Ch. 14, § 402A, p. 3, April 16, 1962.

17. The Advisors to the Reporter are distinguished authorities on Torts: Laurence H. Eldredge; Gerald F. Flood; Fleming James, Jr.; Robert E. Keeton; W. Page Keeton; Calvert Magruder; Wex Smathers Malone; Allan H. McCoid; Clarence Morris; Warren A. Seavey; Samuel D. Thurman, Jr.; Roger J. Traynor; John W. Wade.

18. Dean Prosser credits Spence v. Three Rivers Builders & Masonry Supply Inc., 1958, 353 Mich. 120, 90 N.W.2d 873 with beginning th "real bursting of the dam" when the court applied the strict liability principle to a manufacturer of cinder building blocks.

19. See Greenman v. Yuba Power Products, Inc., 1963, 59 Cal.2d 57, 27 Cal.Rptr.

unanimous call from the authorities in the field of torts.[20] Henningsen v. Bloomfield Motors, Inc., 1960, 32 N.J. 358, 161 A.2d 69, has led this development paralleling the expansion in scope of the manufacturer's liability for negligence that took place after MacPherson v. Buick Motor Co., 1916, 217 N.Y. 382, 111 N.E. 1050.

Professor Noel notes that Greenman v. Yuba Power Products, Inc., 1963, 59

697, 377 P.2d 897; Vandermark v. Ford Motor Co., Cal.App.1963, 33 Cal.Rptr. 175; Simpson v. Powered Products of Michigan, Inc., 1963, Court Com.Pl., 24 Conn.Sup. 409, 192 A.2d 555; Connolly v. Hagi, 1963, 24 Conn.Sup. 198, 188 A.2d 884; Simpson v. Logan Motor Co., D.C.App.1963, 192 A.2d 122; Picker X-ray Corp. v. General Motors Corporation, D.C.Mun.App.1962, 185 A. 2d 919; McBurnette v. Playground Equipment Corp., Fla.1962, 137 So.2d 563; Green v. American Tobacco Co., 1963, Fla.S.Ct., 154 So.2d 169; Hector Supply Co. v. Carter, Fla.App.1960, 122 So. 2d 22; King v. Douglas Aircraft Co., 1964, Fla.App., 159 So.2d 108; Ga.Code Ann. § 96–307; State Farm Mut. Automobile Ins. Co. v. Anderson-Weber Inc., 1961, 252 Iowa 1289, 110 N.W.2d 449; Spence v. Three Rivers Builders & Masonry Supply, Inc., 1958, 353 Mich. 120, 90 N.W.2d 873; Manzoni v. Detroit Coca-Cola Bottling Co., 1961, 363 Mich. 235, 109 N.W.2d 918; Beck v. Spindler, 1959, 256 Minn. 543, 99 N.W.2d 670; Morrow v. Caloric Appliance Corporation, 1963, S.Ct.Mo., 372 S.W.2d 41; Goldberg v. Kollsman Instrument Corp., 1963, 12 N.Y.2d 432, 240 N.Y.S.2d 592, 191 N.E. 2d 81; Jarnot v. Ford Motor Co., 1959, 191 Pa.Super. 422, 156 A.2d 568; General Motors Corp. v. Dodson, 1960, 47 Tenn.App. 438, 338 S.W.2d 655; Va. Code Ann.1960 Supp. § 8–564.3; Wyo. Stats.1961 Cum.Supp. § 40A–2–318; Esborg v. Bailey Drug Co., 1963, 61 Wash. 2d 347, 378 P.2d 298; Baxter v. Ford Motor Co., 1932, 168 Wash. 456, 12 P. 2d 409, 15 P.2d 1118, 88 A.L.R. 521. See also Deveny v. Rheem Manufacturing Company, 2 Cir. 1963, 319 F.2d 124 (Vermont); Brown v. Chapman, 9 Cir. 1962, 304 F.2d 149 (Hawaii); Lartigue v. R. J. Reynolds Tobacco Co., 5 Cir. 1963, 317 F.2d 19 (Louisiana); Reynolds Tobacco Company v. Hudson, 5 Cir. 1963, 314 F.2d 776 (Louisiana); Pritchard v. Liggett & Myers Tobacco Company, 3 Cir. 1961, 295 F.2d 292.

Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897 and Goldberg v. Kollsman Instrument Corp., 1963, 12 N.Y.2d 432, 240 N.Y.S.2d 592, 191 N.E.2d 81, along with Henningsen, have "carried the law far beyond the state it was in at the beginning of the year 1960 when it was so well described in Dean Prosser's influential article, The Assault upon the Citadel (Strict Liability to the Consumer)." Noel, Strict Liability of Manufacturers,

20. Keeton, Products Liability—Liability Without Fault and the Requirement of a Defect, 41 Tex.L.Rev. 855, 857 (1963): Jaeger, Privity of Warranty: Has the Tocsin Sounded?, I Duquesne L.Rev. 1 (1963); Keeton, Roberts, Implied Warranties, 27 Mo.L.Rev. 194 (1962); Products Liability—Current Developments, 40 Tex.Law Rev. 193 (1961); Prosser, Assault Upon the Citadel, 69 Yale L.J. 1099 (1960); Pound, Problem of the Exploding Bottle, 40 B.U.L.Rev. 167 (1960); James, Products Liability, 34 Tex.L.Rev. 192 (1955); James, General Products— Should Manufacturers Be Liable Without Negligence?, 24 Tenn.L.Rev. 923 (1957); Noel, Manufacturers of Products—The Drift Toward Strict Liability, 24 Tenn.L.Rev. 963 (1957); Note, Sales. Liability of Manufacturer to Remote Vendee for Breach of Warranty, 29 B.U.L.Rev. 107 (1949); Jeanblanc, Manufacturers' Liability to Persons Other Than Their Immediate Vendees, 24 Va. L.Rev. 134, 156 (1937); Freezer, Manufacturer's Liability for Injuries Caused By His Products, 37 Mich.L.Rev. 1 (1938). Treatises: 2 Harper & James, Law of Torts § 28.16, p. 1570–1574 (1956); Prosser on Torts § 97, p. 676 (3d Ed. 1964); Frumer & Friedman, Products Liability, § 16–16A, pp. 357– 442.6; 1 Hursh, American Law of Product Liability, § 6.62 (1961). "The development was foreshadowed by most of the scholars who delved into the matter. Some of the writers, however, did not anticipate or recommend as rapid a development as has taken place." (e. g., Green, Should the Manufacturer of General Products Be Liable Without Negligence, 24 Tenn.L.Rev. 928 (1957); Noel, Manufacturers of Products—The Drift Toward Strict Liability, 24 Tenn.L.Rev. 963 (1957) Noel, Strict Liability of Manufacturers, 50 Am.Bar Jour. 446 (1964). Professor Noel sounds a note of caution to federal judges in diversity cases and is critical of Judge Clark's opinion in Deveny v. Rheem Manufacturing Company, 2 Cir. 1963, 319 F.2d 124.

50 Am. Bar Journ. 446, 447 (1964). In the California case, the Supreme Court went back to Justice, now Chief Justice, Traynor's often quoted concurring opinion in Escola v. Coca-Cola Bottling Co., 1944, 24 Cal.2d 453, 150 P.2d 436, in holding that there was no necessity of establishing a breach of warranty in order to find strict liability without negligence. The Court said:

"Although * * * strict liability has usually been based on the theory of an express or implied warranty running from the manufacturer to the plaintiff, the abandonment of the requirement of a contract between them, the recognition that the liability is not assumed by agreement but imposed by law * * * and the refusal to permit the manufacturer to define the scope of its own responsibility for defective products * * * make clear that the liability is not one governed by the law of contract warranties but by the law of strict liability in tort. Accordingly, rules defining and governing warranties that were developed to meet the needs of commercial transactions cannot properly be invoked to govern the manufacturer's liability to those injured by their defective products unless those rules also serve the purposes for which such liability is imposed."

In the New York case, the Court (Desmond, C. J.) also discarded the warranty concept, expanding its earlier holding in Randy Knitwear, Inc. v. American Cyanamid Company, 1962, 11 N.Y.2d 5, 226 N.Y.S.2d 363, 181 N.E.2d 399. The Court observed that "strict liability" was a more accurate phrase than "breach of warranty." [21] The language and thinking of the California and New York courts bear a close resemblance to the language and thinking of the Texas Supreme Court in Decker and Griggs.

The Erie problem this case presents is troublesome, but is not as troublesome as the problem that confronted the First Circuit in Mason v. American Emery Wheel Works, 1 Cir. 1957, 241 F.2d 906. In that case the plaintiff, an employee of a subvendee of the defendant manufacturer, was injured when an emery wheel disintegrated. Mississippi law controlled. The Supreme Court of Mississippi had unequivocally held in Ford Motor Co. v. Myers, 1928, 151 Miss. 73, 117 So. 362, and in a number of earlier cases, that privity was a prerequisite to recovery against a manufacturer. Nevertheless, basing its decision on a dictum in a later case [22] and the evident trend in other states started by MacPherson v. Buick Motor Co., the court dispensed with the necessity of privity. In a notable opinion, Judge Magruder said:

"MacPherson v. Buick Motor Co., supra, started a new trend in this particular field of the law, and its substantive result has found favor

---

21. "If there is to be strict liability in tort, let there be strict liability in tort, let it be declared outright, without an illusory contract mask." Prosser, The Assault Upon the Citadel, 69 Yale L.Jour. 1099, 1134 (1960). Cf. "Defective goods, not warranty, causes the harm to the remote person whether sub-buyer, or stranger. Here, the attack on the 'citadel of privity' is not an attack on privity, but an attack on accepted bases of liability. Warranty is transactional not behavioral. To hold a manufacturer liable where he is free of negligence is to attack the general principle of no liability (apart from contract or transaction) without fault and extend the category of strict tort liability. Warranty is not strict liability in this sense, and it is important that it may have been akin to tort in its origin. The bases for warranty, express or implied, and the bases for nontransactional liability without fault are different. "Liability for breach of warranty should be distinguished not only from liability for deceit or negligence but also from the absolute or strict liability for certain nontransactional conduct (liability without fault). Liability on nontransactional principles for conduct arising from or connected with a transaction is not precluded; but those principles should not be confused with warranty." McCurdy, Warranty Privity in Sales of Goods, 1 Houston L.Rev. 201, 225 (1964).

22. E. I. DuPont De Nemours & Co. v. Ladner, 1954, 221 Miss. 378, 73 So.2d 249.

in § 395 of the American Law Institute Restatement of Torts. If the Supreme Court of Mississippi had recently reconsidered the rule it applied in Ford Motor Co. v. Myers, supra, and had decided to adhere to it on the ground of stare decisis, no doubt the federal courts would have had to accept the local law as so declared. *But it would be gratuitous and unwarranted to assume that the Supreme Court of Mississippi would now so hold, when we bear in mind the readiness of other courts, in conservative jurisdictions at that, to overrule their earlier holdings and to bring their jurisprudence into accord with what is now the overwhelming weight of authority.* * * * We think it is fair to infer from this latest expression by the Supreme Court of Mississippi that it is prepared to reconsider and revise the rule it applied in Ford Motor Co. v. Myers whenever it may have before it a case that squarely presents the issue. We have no doubt that when this occasion does come to pass, the Supreme Court of Mississippi will declare itself in agreement with the more enlightened and generally accepted modern doctrine." (Emphasis supplied). 241 F.2d at 908, 910.

In Grey v. Hayes-Sammons Chemical Co., 5 Cir. 1962, 310 F.2d 291, this Circuit, agreeing with the First Circuit, held that lack of privity was not a bar to a claim by a Mississippi user against a manufacturer of a cotton spray. See also Necaise v. Chrysler Corporation, 5 Cir. 1964, 335 F.2d 562.

Deveny v. Rheem Manufacturing Company, 2 Cir. 1963, 319 F.2d 124, was a products liability case governed by the law of Vermont. The Vermont Court had not spoken to the issue of privity. The Second Circuit upheld the district judge's charge that privity was not necessary in a suit for breach of warranty. Appropriately, Judge Clark wrote for the court. He said:

"The charge abandoned the well-established view still held by a major-ity of American states, that privity of contract between plaintiff and defendant is necessary in a suit for breach of warranty and that, absent such privity, the action should sound in tort on the theory outlined by Judge Cardozo's landmark opinion in MacPherson v. Buick Motor Co., 217 N.Y. 382, 111 N.E. 1050, L.R.A. 1916F, 696. The Vermont supreme court has not spoken to this issue, and thus Judge Gibson was anticipating, rather than following, Vermont law under the Erie principle. Our duty is similar: It 'is not to surmise which line of judicial precedent a Vermont court would follow * * *, but rather, by looking to the same sources which a Vermont court would presumably consult and by weighing the comparative reasoning of learned authors and conflicting judicial decisions for their intrinsic soundness, to define the pertinent law which when thus ascertained is presumably the law of Vermont even though as yet unannounced by a Vermont Court.' Socony-Vacuum Oil Co. v. Continental Casualty Co., 2 Cir., 219 F.2d 645, 647. * * * While we recognize that the position adopted by Judge Gibson is still a minority view, we agree that it reflects a more modern conception of manufacturers' liability than does the traditional requirement of privity. Results which are consonant with justice are not always to be reached by a mere counting of noses, judicial or otherwise, although it does give us comfort to realize that we are not alone in our holding on this issue." 319 F.2d 124 at 129, 130.

In Chapman v. Brown, D.Hawaii, 1961, 198 F.Supp. 78, aff'd Brown v. Chapman, 9 Cir. 1962, 304 F.2d 149, after an exhaustive study of the American authorities on privity, the court concluded that a "clear majority of jurisdictions *today* have rejected the requirement of privity in implied warranty cases of this nature, *either in whole or in part*". (Emphasis by the court.) In that case the plaintiff

was injured when a borrowed hula skirt ignited. Making a "guess at what the Hawaii Supreme Court would decide in a similar case", the Court held that privity was not a prerequisite to recovery. Chief Judge Tavares pointed out:

"[If privity is not necessary] for *food cases,* because of *'public policy,'* by what reasoning can it be held that the barrier excludes allowance of the same remedy to other non-'buyers' as to whom the *public policy of protection appears to be equally justified.* It appears that the proponents of such an exclusionary theory are attempting to *freeze* the doctrine of privity at a specific point in its development, contrary to all the traditions of the common law. \* \* \* [T]he privity requirement has again suffered steady erosion in jurisdiction after jurisdiction, even in implied warranty cases. In these respects this process has truly exemplified the capacity of the common law to originate, modify, abandon, extend or adjust ideas, theories and rules to meet changing conditions or achieve greater perfection in rendering justice. Those who would freeze privity at any one stage of its development are both ignoring its common-law origin as an imperfect idea in the fallible human brains of certain judges—not a divine unchanging principle in which there can be no error—and denying its common-law capacity to develop. The truth is that privity was never a static concept, and it should not now be any more static than the common law is static, unless clearly restrained by express statute." 198 F.Supp. 78 at 104, 105.

This Court has the same deference for the Texas Supreme Court that Judge Magruder had for the Mississippi Supreme Court in Mason v. American Emery Wheel Works. Echoing Judge Magruder, we conclude that it would be "gratuitous and unwarranted" to assume that the forward-looking Supreme Court of Texas, which in Decker was one of the leaders in the assault on the citadel of privity, would now hold that privity is required in non-food cases, "when we bear in mind the readiness of other courts, in conservative jurisdictions at that, to overrule their earlier holdings and to bring their jurisprudence into accord with what is now the overwhelming weight of authority". 241 F.2d 906. Unlike the Mississippi Supreme Court, however, the Texas Supreme Court would have to hold only: what was right in Texas in 1942 when Decker addressed itself to food, is right in 1964 as to any product that has a defect unreasonably dangerous enough to cause harm to its user.[23] Man does not live by bread alone.

The judgment is reversed and remanded for proceedings consistent with this opinion.

---

23. "Though the Texas courts have not extended this implied warranty [imposed by law to protect public health, as set forth in Decker] to other than food cases, it is clear that the day is near at hand when 'social justice' will require this extension. \* \* \* Up to the present, the food cases present the only group of cases in which the Supreme Court of Texas has declared a warranty of public policy. However a number of other jurisdictions are on the move and it seems only practical to argue that public policy might also require our court to formulate similar strict liability rules to other products that are known to be dangerous. \* \* \* The decisions of the Texas Supreme Court have based their holding in food cases on social justice and have definitely stated that no longer is privity required. It is submitted that the extension of strict liability in Texas to other manufacturers should also be based on social justice. The writer feels that in this way the law will keep pace with changes in modern living." Eggleston, Comment—Immunities of Manufacturers and Other Suppliers of Chattels, 6 Sou. Tex.L.J. 216, 222, 230 (1962).