**IDEAL STRUCTURES CORPORATION,**
Appellant,

v.

**LEVINE HUNTSVILLE DEVELOP-
MENT CORPORATION et al.,**
Appellees.

No. 23668.

United States Court of Appeals
Fifth Circuit.

June 19, 1968.

J. Robert Miller, Culver & Miller, Huntsville, Ala., for appellant.

Ernest L. Potter, Jr., Bell, Richardson, Cleary, McLain & Tucker, Huntsville, Ala., for appellees.

Before RIVES, GOLDBERG and DYER, Circuit Judges.

GOLDBERG, Circuit Judge:

This is a diversity case involving the statute of frauds. The district court, sitting as an Alabama court, adumbrated changes and predicted law to come in Alabama vis-a-vis its choice of law. The court thus rejected the application of the New York statute of frauds and applied the Alabama statute of frauds. Envisioning no escape from the strictures of the Alabama statute, the district court granted a summary judgment. Ideal Structures Corp. v. Levine Huntsville Development Corp., N.D.Ala.1966, 251 F. Supp. 3. Although we can only laud the district court for its perceptive, sensitive, and scholarly analysis in the complex conundrums of conflicts of law, our bondage to *Erie* does not permit us to by-pass a channel whose riverbed spans nigh unto a century. We, therefore, must apply the New York statute of frauds and reverse.

(a) Application of Rule 60(b)

Before delineating the factual prelude to litigation, we pause to consider what facts are before us. On February 16, 1966, the district court granted partial summary judgment for the defendant, Levine Huntsville, on the statute of frauds issue. (Ideal had sued for quantum meruit as well as for breach of contract.) Treating the judgment as one concerning "a controlling question of law as to which there is substantial ground for difference of opinion," the court then certified the order for an immediate appeal under 28 U.S.C. § 1292(b). Ideal filed its notice of appeal on March 18, 1966. Five months later Ideal filed a Motion for Vacating Partial Summary Judgment, accompanied by an unsigned but extensive written agreement between Ideal and Levine Huntsville. Also included were affidavits which attested to the validity of the agreement and which sought to obtain the redemptive grace of Rule 60(b).[1] The district court carefully considered the motion and supporting documents and concluded that *"on the merits* such motion is due to be denied." (Emphasis added.) The court added: "The court is aware that, notwithstanding the pendency of the appeal, it has jurisdiction to pass upon the merits of such motion." Ideal filed notice of appeal on the latter action and filed a motion to consolidate the two proceedings, which motion was granted by this Court.

We view the district court's denial of Ideal's motion to vacate "on the merits" as incorporating a decision to expand the record through Rule 60(b). Compare In re Casco Chemical Co., 5 Cir. 1964, 335 F.2d 645, 650–652. Though we interpret the record differently than did the district court, we commend that court's refusal to be niggardly in the quest of facts. As was stated in In re Casco Chemical Co., supra:

"In the process of this exploration, it should be kept in mind that rule 60(b) is to be given liberal construction. United States v. Gould, 5 Cir. 1962, 301 F.2d 353; Michigan Surety Co. v. Service Machinery Corp., 5 Cir., 1960, 277 F.2d 531; Serio v. Badger Mut. Ins. Co., 5 Cir. 1959, 266 F.2d 418; cert. denied, 361 U.S. 832, 80 S.Ct. 81, 4 L.Ed.2d 73; 3 Barron & Holtzoff §

---

1. Rule 60(b): "Mistakes; Inadvertence; Excusable Neglect; Newly Discovered Evidence; Fraud, etc. On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons; (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); * * * or (6) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the judgment, order, or proceeding was entered or taken."

1332 n. 9 (Wright Supp.1963)." 335 F.2d at 651 (at fn. 18), quoted at American Employers Ins. Co. v. Sybil Realty, Inc., E.D.La.1967, 270 F.Supp. 566, 569–70.

■ We, therefore, view this appeal as encompassing the entire record from both district court actions. Our standard for review, as in all summary judgments, is whether there is any "genuine issue as to any material fact and * * * [whether] the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c).

### (b) Facts

For purposes of this appeal we accept as true the facts according to Ideal. Moreover, our recitation of each party's actions will be only a sketch of the facts reported by the district court and supplemented by Ideal's Motion to Vacate.

Ideal, a Delaware corporation, is a subsidiary of Transcontinental Investing Corporation (TIC), a company which has extensive experience in the financing and building of real estate projects. Both Ideal and TIC have their principal places of business in New York City. Levine Huntsville is an Alabama corporation which, beginning in 1965, was involved mainly in building and developing a shopping center in Huntsville, Alabama. At the time of the events which led to the present litigation, Levine Huntsville's president and principal stockholder was Lawrence Levine. Lawrence and his father, Louis Levine, also a Levine Huntsville stockholder, were both residents of New York City, and the corporation had an office in New York City.

In February, 1965, Lawrence Levine approached officers of Ideal seeking financial assistance. Levine Huntsville's plan for a shopping center had developed only to the point that it had obtained long-term ground leases for forty acres of land and an option to acquire fee title to an adjacent four-acre tract. Having exhausted its own financial resources, Levine Huntsville was in arrears on the rents due under the ground leases, and it

was unable to exercise its purchase option or to begin construction. Ideal negotiated an oral agreement with Levine Huntsville in which Ideal would finance the remaining steps to the construction of the shopping center, would perform certain services necessary to preserve the project, and would eventually share the proceeds from the completed shopping center. The joint venture signifying this agreement was to be named "Huntsville Associates."

Without belaboring the specifics, suffice it to say that through Ideal's efforts and financial support the project was kept alive until May 27, 1965, when the now-successful joint venture was to be sanctified and solidified by solemn writing. On that day Ideal's president, vice president, and counsel arrived at the prescribed time at the office of Levine Huntsville's counsel. Four other persons who had roles to play at the closing were present: Louis Levine, Levine Huntsville's counsel, a title company representative, and the architect for the shopping center. However, the chair set out for Lawrence Levine remained empty, and forty-five minutes after all parties had arrived, Levine telephoned to cancel the agreement. Evidently, he had obtained a better deal elsewhere.

We have sifted the various comings, goings, and negotiations for all written evidence of an agreement prior to May 27.

(1) On May 13 Ideal supplied $81,924.-54 to Levine Huntsville to purchase the four-acre tract mentioned above. Title was conveyed to Levine Huntsville by delivery of a deed dated April 30, 1964. At the same time (on May 13) Levine Huntsville, through Lawrence Levine, drafted a letter to Ideal, which was signed as "accepted and agreed" by Ideal's president. The letter related that Ideal would hold the deed, with Levine Huntsville's having the right to repurchase after forty-five days. Neither party could encumber the property

during the forty-five day period. The letter concluded:

"It is further understood and agreed that you and we are negotiating a joint venture agreement whereunder we would own the subject property as tenants-in-common. If such agreement is executed within the aforementioned forty-five (45) day period, then title to the subject property shall be conveyed to you and us as tenants-in-common for the sum of Ten ($10.00) Dollars, and in such event the sum of $81,924.54 advanced pursuant to this agreement shall be considered part of the $300,000.00 initial loan you are to make or cause to be made to the venture."

(2) On May 4 the Israel Discount Bank (IDB), having been contacted by Ideal, drafted a commitment letter for a loan in the amount of $2,000,000. The letter, addressed to "Huntsville Associates," provided in part:

"1. The Borrower shall be Huntsville Associates, a joint venture for the construction and development of Madison Mall Shopping Center in Huntsville, Alabama, the joint venture to consist of Levine Huntsville Development Corporation ('Levine'), an Alabama corporation, having an office at 10 East 43rd Street, New York, N. Y. and Ideal Structures Corp. ('Ideal'), a Delaware corporation, being a wholly owned subsidiary of Transcontinental Investment Corporation ('TIC'), having an office at 200 East 42nd Street, New York, N. Y."

Lawrence Levine and Ideal's president signed the letter as "accepted" on May 14, 1965. At Levine's insistence the letter was amended to limit the Borrower's liability to counsel fees and disbursements of counsel to $5,000 in case the commitment failed to close.

(3) About the same time, Ideal and Levine Huntsville opened a bank account in The Chase Manhattan Bank under the name of "Huntsville Associates." The persons authorized to sign the account were Lawrence Levine and three officers of Ideal. All four persons, besides signing the signature authorization card, also signed a letter addressed to The Chase Manhattan Bank, which letter began as follows:

"The undersigned severally represent *and agree* as follows:

The undersigned *are co-venturers* in a joint venture for the purpose of development of a shopping center and as such co-venturers *are conducting business* under the name and style of Huntsville Associates. In connection with the operation of such joint venture, the undersigned desire to open a checking account with you." (Emphasis added.)

Neither the signature authorization card nor the letter is dated.

(4) In March, 1965, Ideal and Levine Huntsville began drawing up a formal joint venture instrument. On May 5 Levine Huntsville's counsel delivered to Ideal's president a "final draft" of the instrument. Changes were made at the May 7 meeting with IDB. At the May 14 meeting Lawrence Levine handed to IDB's counsel an undersigned copy of the joint venture instrument along with the letter of commitment from IDB, described supra. No copy of the joint venture instrument was ever signed; however, Ideal asserts that Lawrence Levine orally accepted the terms of the instrument. The instrument is quite thorough, covering fifty-nine pages in the Supplemental Record. On remand, Ideal seemingly will seek to alter only the profit-sharing provision, which alteration, it claims, was acknowledged both by oral agreement and in writing on Levine Huntsville's copy of the instrument.

It is the above assemblage of instrumentation which, after choosing the applicable statute of frauds, we synthesize for trial staying power.

### (c) The Choice of Law

The district court determined that, although the Supreme Court of Alabama had in the past consistently embraced the *lex loci contractus*, the state's choice-of-law rule was bound for a change. We cannot improve on that court's analysis, which stressed the following legal developments since the last pronouncement by the Supreme Court of Alabama: (1) the recent trend of decisions in other states adopting a "most significant relationship" rule; (2) increased commentary criticism of the old rule; (3) espousal of the modern rule in the tentative drafts of the Second Restatement on Conflict of Laws, Restatement (Second); Conflict of Laws §§ 332 and 334 (Ten. Draft No. 6, 1960) and Restatement (Second), Conflict of Laws, § 599a (Ten. Draft No. 11, 1965); and (4) the Alabama Legislature's enactment of the Uniform Commercial Code and the specific provision therein calling for "significant relationship"

considerations in choosing the law controlling sales of personal property. Code of Ala., Tit. 7A, § 1–105(1) (effective midnight December 31, 1966).

If we had this question before us as a matter of first impression, we might follow under the district court's banner.[2] However, the rule in Alabama boasts a long and proud vintage. New Hampshire Fire Ins. Co. v. Curtis, 1955, 264 Ala. 137, 142, 85 So.2d 441, 446; Franklin Life Ins. Co. v. Ward, 1939, 237 Ala. 474, 187 So. 462, 466–467; J. R. Watkins v. Daniel, 1934, 228 Ala. 399, 153 So. 771, 772; Fourth Nat. Bank of Montgomery v. Woolfolk, 1929, 220 Ala. 344, 125 So. 217, 218; J. R. Watkins Co. v. Hill, 1926, 214 Ala. 507, 509, 108 So. 244, 245; Furst & Thomas v. Sandlin, 1922, 208 Ala. 490, 94 So. 740, 742 (and cases cited therein). United States Fidelity & Guaranty Co. v. Slifkin, N.D.Ala.1961, 200 F.Supp. 563, 566, 571. See also Macey v. Crum, 1947, 249 Ala. 249, 30 So. 2d 666, 669; Coral Gables, Inc. v. Patterson, 1938, 236 Ala. 201, 181 So. 236 (involving a conveyance of an interest in land). Throughout this judicial geneology no Alabama court has deviated from

2. Labeling and describing the new choice-of-law banner has proved to be a complicated process. The original break from *lex loci contractus* was accomplished in the name of a "grouping of the contacts" or a "center of gravity" test. Auten v. Auten, 1954, 308 N.Y. 155, 124 N.E.2d 99, 50 A.L.R.2d 246. The Restatement revisors, however, adopted the term "most signficant relationship." Restatement (Second), Conflict of Laws § 332 (Ten. Draft No. 6, 1960). Another choice-of-law refinement, the "functional approach," is being advanced by Professors von Mehren and Trautman in their casebook, The Law of Multistate Problems: Cases and Materials on Conflict of Laws. Boston: Little, Brown & Co., 1965. We quote from their initial statement of the "functional approach," which is analyzed in depth thereinafter:

"With a view to suggesting our underlying philosophy, we speak of a functional approach or analysis, one that aims at solutions that are the rational elaboration and application of the policies and purposes underlying specific

legal rules and the legal system as a whole. In conflict of laws, this approach requires one to consider the differences, in functional terms, between domestic and multistate transactions and to handle the latter in ways that take into account not only the policies expressed in domestic rules as they are relevant in a multistate context but also multistate policies as such." (page 76).

See a review of this book by Judge Charles D. Breitel of the New York Court of Appeals in 81 Harvard L.Rev. 1585 (1968). See also Currie, Selected Essays on the Conflict of Laws (1963); Stumberg, Principles of Conflict of Laws (3rd ed. 1963); Symposium, "Comments on Babcock v. Jackson, A Recent Development in Conflict of Laws" (by Professors Cavers, Cheatam, Currie, Ehrenzweig, Leflar, and Reese), 63 Colum.L.Rev. 1212 (1963); Symposium, "Ehrenzweig's Proper Law and Proper Forum" (Professors Cavers, Currie, Ehrenzweig, Kay, Leflar, and Rheinstein), 18 Oklahoma L. Rev. 233 (1965); and voluminous additional works.

the principles set out in J. R. Watkins Co. v. Hill, supra:

"[T]he nature, obligation, validity and interpretation of a contract are according to the laws of the state where made, or where performance begins, unless it is apparent that the parties manifest a mutual intention to the contrary, or unless it is to be performed in some other place, in which case the law of the other place and of performance will govern." 108 So. at 245.

To be sure, the rule in Klaxon Co. v. Stentor Electric Mfg. Co., Inc., 1941, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477,[3] may not bind jet-age courts to horse-and-buggy concepts. See Meredith v. City of Winter Haven, 1943, 320 U.S. 228, 64 S.Ct. 7, 88 L.Ed. 9; Bernhardt v. Polygraphic Co. of America, 1956, 350 U.S. 198, 204–205, 76 S.Ct. 273, 100 L.Ed. 199, 206 (see also Justice Frankfurter's concurring opinion at 350 U.S. 205–212 76 S.Ct. 227–281). Moreover, in the forecasting of continuing state progress, we accept Judge Wisdom's scholarly— and accurate—prediction in Putman v. Erie City Manuf. Co., 5 Cir. 1964, 338 F.2d 911, as an example of diversity jurisprudence at its best.[4] Nevertheless, our *Erie* antenna is not so sensitive that we can gauge every variant breeze of change. Forecasting the repudiation of a fixed legal principle is not simplistic.

We borrow from the Second Circuit on this point:

"In any event, the proper function of this Court is to ascertain what New York law is, and not to speculate about what it will be, or in Learned Hand's felicitous phrase, 'to embrace the exhilarating opportunity of anticipating a doctrine which may be in the womb of time, but whose birth is distant.' Spector Motor Service v. Walsh, 139 F.2d 809, 823 (2nd Cir. 1943) (dissent) vacated 323 U.S. 101, 65 S.Ct. 152, 89 L.Ed. 101 (1944). It is certainly not our function to apply the rule we think better or wiser. Klaxon Co. v. Stentor Electric Mfg. Co., supra, 313 U.S. at p. 497, 61 S.Ct. 1020, 85 L.Ed. 1477. If we were to apply the Auten rule as appellants ask, we would be formulating the legal policy and mind of the state in an area where there would appear to be a clearly enunciated state rule. Yoder v. Nu-Enamel Corp., 117 F.2d 488, 489 (8th Cir. 1941)." Hausman v. Buckley, 2 Cir. 1962, 299 F.2d 696, 705, 704–705, 93 A.L.R.2d 13–40, cert. den., 369 U.S. 885, 82 S.Ct. 1157, 8 L.Ed.2d 286.

Likewise, in considering a question of state substantive law, our Court has stated:

"We are not permitted to overrule a decision of the Supreme Court of Geor-

---

3. "We are of opinion that the prohibition declared in Erie Railroad v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, against such independent determinations by the federal courts extends to the field of conflict of laws. The conflict of laws rules to be applied by the federal court in Delaware must confrom to those prevailing in Delaware's state courts. Otherwise the accident of diversity of citizenship would constantly disturb equal administration of justice in coordinate state and federal courts sitting side by side. See Erie Railroad v. Tompkins, supra, at 74–77, 58 S.Ct. 817, at 820–822, 82 L.Ed. 1188, 114 A.L.R. 1487. Any other ruling would do violence to the principle of uniformity within a state upon which the Tompkins decision is based. Whatever

lack of uniformity this may produce between federal courts in different states is attributable to our federal system, which leaves to a state, within the limits permitted by the Constitution, the right to pursue local policies diverging from those of its neighbors. It is not for the federal courts to thwart such local policies by enforcing an independent 'general law' of conflict of laws." 313 U.S. at 496, 61 S. Ct. at 1021.

4. In 1967 the Texas Supreme Court upheld Judge Wisdom's "Erie educated guess" by applying the Restatement concept of products liability to non-food products. McKisson v. Sales Affiliates. Tex.1967, 416 S.W.2d 787. See also Shamrock Fuel & Oil Sales Co. v. Tunks, Tex.1967, 416 S.W.2d 779.

gia on any theory that the Georgia Supreme Court, as presently constituted, would not be bound by what it had said when differently constituted some years ago. Nor can we apply, in diversity cases, a rule of stare decisis which permits us to weigh the degree of authority belonging to a precedent by its agreement with the spirit of the times. The Georgia courts can overrule their prior decisions. The Federal Courts cannot do so. Moore v. Illinois Central Railroad Co., 312 U.S. 630, 61 S.Ct. 754, 85 L. Ed. 1089. It is the duty of a Federal Court to ascertain what the state law is, not what it ought to be. Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477. To hold otherwise would be to return to the overthrown doctrine of Swift v. Tyson, 16 Pet. 1, 10 L.Ed. 865." Polk County, Georgia v. Lincoln National Life Ins. Co., 5 Cir. 1959, 262 F.2d 486, 490.

See also Missouri Pacific Ry. Co. v. Owen, 5 Cir. 1962, 306 F.2d 887, 890; Det Bergenske Dampskibsselskab v. Sabre Shipping Corp., 2 Cir. 1965, 341 F. 2d 50, 53, 12 A.L.R.3d 1081; Campbell v. Village of Silver Bay, 8 Cir. 1963, 315 F.2d 568, 575.

In Bernhardt v. Polygraphic Co. of America, 1956, 350 U.S. 198, 204–205, 76 S.Ct. 273, 277, 100 L.Ed. 199, 206, the Supreme Court, by negative implication, listed several factors which may justify a federal *court's* reinterpretation of state law:

"That case was decided in 1910. But it was agreed on oral argument that there is no later authority from the Vermont courts, that no fracture in the rules announced in those cases has appeared in subsequent rulings or dicta, and that no legislative movement is under way in Vermont to change the result of those cases. * * * Were the question in doubt or deserving further canvass, we would of course remand the case to the Court of Appeals to pass on this question of Vermont law. But, as we have indicated, there appears to be no confusion in the Vermont decisions, no developing line of authorities that casts a shadow over the established ones, no dicta, doubts or ambiguities in the opinions of Vermont judges on the question, no legislative development that promises to undermine the judicial rule. We see no reason, therefore, to remand the case to the Court of Appeals to pass on this question of local law." 350 U.S. at 204–205, 76 S.Ct. at 277.[5]

We find no such factors, however, in this case. The choice-of-law reference in the Uniform Commercial Code may eventually draw the Alabama courts into a general application of the "most significant relationship" test, but this prediction cannot approach inevitability. Thus, in American Service Mutual Ins. Co. v. Bottum, supra note 5, the Eighth Circuit, though seemingly approving Chief Judge Lynne's initiative in our case as to Alabama law, indicated that it would be unable to change the traditional choice-of-law rule in South Dakota. The Court cited one statutory reference which supported the traditional view, but it omitted any reference to the Uniform Commercial Code which had recently been adopted in South Dakota (effective July 1, 1967) and which contained the same sales provision mandating a "most significant relationship" test as that relied on by Chief Judge Lynne. See also Center Chemical Co. v. Avril, Inc., 5

---

5. Compare Justice Frankfurter's positive suggestion of change in his concurring opinion in Bernhardt, 350 U.S. at 205–212, 76 S.Ct. at 277–281. This aspect of the Bernhardt decision has been analyzed in recent opinions. See Putman v. Erie City Manuf. Co., supra, 338 F. 2d at 917 (at fn. 14) (and authority cited therein); American Service Mutual Ins. Co. v. Bottum, 8 Cir. 1967, 371 F.2d 6, 9 (at fn. 2). The latter analysis included references to Bernhardt v. Polygraphic Co. of America; Meredith v. City of Winter Haven; Putman v. Erie City Manuf. Co, and even the district court opinion in the case at bar.

Cir. 1968, 392 F.2d 289 [No. 24403, April 11, 1968].

In Hopkins v. Lockheed Aircraft Corp., 5 Cir. 1966, 358 F.2d 347, our Circuit elected to certify a choice-of-law problem concerning wrongful death statutes to the Florida Supreme Court.[6] The Florida Supreme Court's struggle with the problem demonstrates that traditional choice-of-law concepts have not only a legitimate lineage but also respectable contemporary companions. After the certification by our Court, the Florida Supreme Court at first adopted the "most significant relationship" test, specifically rejecting the traditional *lex loci delicti* (place of the wrong) rule. It, therefore, refused to apply the limitation of damages stipulated in the wrongful death statute of Illinois, where the death had occurred. Hopkins v. Lockheed Aircraft Corp., Fla.1967, 201 So.2d 743.[7] On rehearing, however, the Court reversed its holding and modified its choice-of-law stand. Hopkins v. Lockheed Aircraft Corp., Fla.1967, 201 So.2d 749. The conclusion of the majority opinion is especially relevant to the problem at bar:

> "[T]here are obvious virtues, in consistency and stability, supporting the application of laws whenever possible in a cohesive rather than piecemeal fashion. In other words, the applicability or inapplicability of foreign law should so far as possible be based on objective and stable standards. While the place at which an event occurs may indeed be fortuitous, that circumstance nevertheless seems to me of primary importance in determining the legal effect to be accorded any occurrence upon which a cause of action depends. A domiciliary or other forum in which a transitory action is brought may in these times be equally fortuitous.

> "We are not persuaded that this case presents any necessity or justification for abandonment of guiding principles in past decisions or for expression of broad rules better left to be established by the slower but more certain method of judicial case disposition." 201 So.2d at 751–752.

Similarly, in a recent Texas case the Texas Supreme Court refused to embrace the "most significant relationship" test as it related to Texas' wrongful death statute. Marmon v. Mustang Aviation, Inc., Tex.1968, 430 S.W.2d 182. Instead, the majority of that Court adhered to an 1884 judicial interpretation limiting extraterritorial application of the statute, even though, as the majority admitted, that interpretation had been based on an erroneous constitutional concept. A comparison of the majority and dissenting opinions in the *Marmon* case suggests that the Texas Supreme Court has strong reservations on the new choice-of-law developments.

We view the *Hopkins* and *Marmon* cases as forebodings of danger to federal courts which would hasten the repudiation of a state's choice of law. Though federal courts should keep abreast with imminent change, our footing should be reasonably sure if not absolutely certain.[8]

Having settled on the firm ground of past Alabama decisions, we need not engage in extensive speculation as to which State's substantive laws the Alabama courts would apply. The existing

---

6. The final opinion in that case, Hopkins v. Lockheed Aircraft Corp., 5 Cir. 1968, 394 F.2d 656 [No. 22518, May 16, 1968], presents a step-by-step history of the specific choice-of-law problem in Florida as well as two colorful evaluations of diversity effectiveness.

7. The majority opinion took pains to demonstrate that Florida (unlike Alabama) had not consistently followed traditional conflicts rules.

8. The district court below, at footnote 7 of its opinion, cites two cases in which federal courts adopted modern choice-of-law rules in states which had not previously had such rules. Watts v. Pioneer Corn Co., 7 Cir. 1965, 342 F.2d 617; Fahs v. Martin, 5 Cir. 1955, 224 F.2d 387. In each case, however, the federal court could find some state judicial support for the new concepts, and in neither case was the traditional rule firmly entrenched.

Alabama rule, as set out in J. R. Watkins Co. v. Hill, quoted supra, instructs the court to be bound by the law where the contract was made "unless it is apparent that the parties manifest a mutual intention to the contrary, or unless it is to be performed in some other place, in which case the law of the other place and of performance will govern." 108 So. at 245. The latter exception does not compel an application of Alabama substantive law, as was demonstrated so clearly by Chief Judge Lynne in an earlier case:

"[I]t is evident from Hill [J. R. Watkins Co. v. Hill] and other cases— Franklin Life Ins. Co. v. Ward, 237 Ala. 474, 187 So. 462 (1939); Southern Express Co. v. Gibbs, 155 Ala. 303, 46 So. 465, 18 L.R.A.,N.S., 873 (1908); Southern Ry. v. Harrison, 119 Ala. 539, 24 So. 552, 43 L.R.A. 385 (1898) —that the place of performance governs validity and legal effect only when it affirmatively *appears* in the contract that performance is to be in some *particular* place other than that of execution. Moreover, as clearly expressed in Southern Ry. v. Harrison, supra, the exception applies only when it is contemplated that performance is to be *wholly* in another place. Since neither is true with respect to the loan agreements in the present case, New York law should be applied." United States Fidelity & Guaranty Co. v. Slifkin, N.D.Ala.1961, 200 F.Supp. 563, 571.

It should be emphasized that the alleged contract in the case at bar was primarily one of joint venture, not one of construction. While the construction was to be performed only in Alabama, acts involved in the joint venture were to be performed partly, if not "most significantly," [9] in New York.

As for the parties' "mutual intention," the unsigned joint venture agreement contained the following provision:

"36. This agreement shall be construed and enforced in accordance with the laws of the State of New York."

Of course, this clause would not be binding on the parties unless the agreement is found to be enforceable, which is the ultimate issue in controversy. However, with due regard for Levine Hunts-

---

9. The following excerpt from a Second Circuit opinion by Judge Friendly is extremely relevant to our case. It indicates that, even if we were to project change in Alabama's rigid choice-of-law rule, we should apply New York law to determine the validity of the contract at bar:

"A New York court would first have to consult the New York conflict of laws to determine what state's contract law applies. The law governing application of the parol evidence rule is the same as that chosen to determine the validity of the contract. American Law Institute, Restatement of the Law Second, Conflict of Laws, Tentative Draft No. 6, § 346, comment d. Applying the principle of Auten v. Auten, 308 N.Y. 155, 124 N.E.2d 99, 50 A.L.R.2d 246 (1954), New York would select itself as the state having the most significant contacts on that issue. Although Automatic is a Delaware corporation with its manufacturing plant in Iowa, it maintained an office in New York, where Chamberlin, its president, spent most of his time, and held special board meetings in New York, including the meeting that acted on the contract here in suit. Richland is a New York corporation and Abrams a citizen of New York. The negotiations leading up to the Bellanca-Automatic transaction took place in New York, and the writing dated December 23, 1955, was prepared by Francis J. Purcell, a New York lawyer, in a New York law office, where Abrams and representatives of Automatic and Bellanca were present, and was signed there. These contracts are more significant than those of Ohio, where the rubber machinery was, or of Iowa, where, arguably, it was to be sent. All this is especially so when the issue is whether Richland made any contract as to rubber machinery at all." Kirtley v. Abrams, 2 Cir., 1962, 299 F.2d 341, 345 (at fn. 6).

See also Speare v. Consolidated Assets Corp., 2 Cir. 1966, 367 F.2d 208, 212; Bond v. Oak Manuf. Co., 3 Cir. 1961, 293 F.2d 752, 753. Cf. Judge Traynor's analysis in Bernkrant v. Fowler, 1961, 55 Cal.2d 588, 12 Cal.Rptr. 266, 360 P.2d 906, 909–910.

ville's cautionary instructions against bootstrapping, we can say that the existence of this cause, drawn by Levine Huntsville's own attorneys, qualifies as supporting evidence. At the least, it reaffirms our application of New York substantive law under the general Alabama conflicts rule.

(d) The New York Statute of Frauds

Section 5–703 of New York's General Obligations Law, McKinney's Consol. Laws, c. 24–A, reads as follows:

> "General Obligations Law, Section 5–703. Conveyances and contracts concerning real property required to be in writing
>
> 1. An estate or interest in real property other than a lease for a term not exceeding one year, or any trust or power; over or concerning real property or in any manner relating thereto, cannot be created, granted, surrendered or declared, unless by act or operation of law, or by a deed or conveyance in writing, subscribed by the person creating, granting, assigning, surrendering or declaring the same, or by his lawful agent, thereunto authorized by writing. But this subdivision does not affect the power of a testator in the disposition of his real property by will; nor prevent any trust from arising or being extinguished by implication or operation of law, nor any declaration of trust from being made by a writing subscribed by the person declaring the same.
>
> 2. A contract for the leasing for a longer period than one year or for the sale of any real property, or interest therein, is void unless the contract or some note or memorandum thereof, expressing the consideration, is in writing, subscribed by the party to be charged, or by his lawful agent thereunto authorized in writing.
>
> 3. A contract to devise real property or establish a trust in real property, or any interest therein or right with reference thereto, is void unless the contract or some note or memorandum

thereof is in writing and subscribed by the party to be charged therewith, or by his lawfully authorized agent.

> 4. Nothing contained in this section abridges the powers of courts of equity to compel the specific performance of agreements in cases of part performance."

For purposes of the substantive problem before us the cornerstone of judicial analysis is the 1953 Court of Appeals opinion Crabtree v. Elizabeth Arden Sales Corp., 1953, 305 N.Y. 48, 110 N.E. 2d 551. In that case the plaintiff Crabtree had negotiated with Elizabeth Arden Sales Corp. concerning employment as sales manager. The written products of such negotiations consisted of three items: an unsigned memorandum prepared by a secretary during an interview with the president of Elizabeth Arden and two payroll cards, the earlier of which was initialed by an executive vice-president and general manager of the corporation and the latter of which was signed by the comptroller of the corporation. The payroll cards indicated salary schedules and periodic salary increases but contained no information regarding the term of employment. However, the unsigned memorandum made during the initial interview contained, in addition to a salary schedule, the notation "2 years to make good." After working for Elizabeth Arden for only six months, Crabtree fell into dispute over salary increases. Claiming a breach of contract, he quit work and sued for damages.

The trial court ruled against Crabtree on two grounds: (1) insufficient evidence to support Crabtree's claim for a two-year contract of employment, and (2) insufficient written evidence of any contract between Crabtree and Elizabeth Arden. The Appellate Division affirmed, thus sending the case to the Court of Appeals and to the pen of Chief Judge (then Judge) Fuld. We find the following analysis relevant to the determination of our case:

> "The statute of frauds does not require the 'memorandum * * * to be in one document. It may be pieced

together out of separate writings, connected with one another either expressly or by the internal evidence of subject matter and occasion.' Marks v. Cowdin, supra, 226 N.Y. 138, 145, 123 N.E. 139, 141; see, also, 2 Williston, op. cit., p. 1671; Restatement Contracts, § 208, subd. [a]. Where each of the separate writings has been subscribed by the party to be charged, little if any difficulty is encountered. See, e. g., Marks v. Cowdin, supra, 226 N.Y. 138, 144–145, 123 N.E. 139, 141. Where, however, some writings have been signed, and others have not—as in the case before us—there is basic disagreement as to what constitutes a sufficient connection permitting the unsigned papers to be considered as part of the statutory memorandum. The courts of some jurisdictions insist that there be a reference, of varying degrees of specificity, in the signed writing to that unsigned, and, if there is no such reference, they refuse to permit consideration of the latter in determining whether the memorandum satisfies the statute. See, e. g., Osborn v. Phelps, 19 Conn. 63; Hewett Grain & Provision Co. v. Spear, 222 Mich. 608, 193 N.W. 291. That conclusion is based upon a construction of the statute which requires that the connection between the writings and defendant's acknowledgment of the one not subscribed, appear from examination of the papers alone, without the aid of parol evidence. The other position—which has gained increasing support over the years—is that a sufficient connection between the papers is established simply by a reference in them to the same subject matter or transaction. See, e. g., Frost v. Alward, 176 Cal. 691, 169 P. 379; Lerned v. Wannemacher, 9 Allen 42, 91 Mass. 412. The statute is not pressed 'to the extreme of a literal and rigid logic', Marks v. Cowdin, supra, 226 N.Y. 138, 144, 123 N.E. 139, 141, and oral testimony is admitted to show the connection between the documents and to establish the acquiescence, of the party to be charged, to the contents of the one unsigned. See Beckwith v. Talbot, 95 U.S. 289, 24 L.Ed. 496; Oliver v. Hunting, 44 Ch. pp. 205, 208–209; see, also, 2 Corbin, op. cit., §§ 512–518; cf. Restatement, Contracts, § 208, subd. [b], par. [iii].

"The view last expressed impresses us as the more sound, and, indeed—although several of our cases appear to have gone the other way, see e. g., Newbery v. Wall, 65 N.Y. 484; Wilson v. Lewiston Mill Co., 150 N.Y. 314, 44 N.E. 959—this court has on a number of occasions approved the rule, and we now definitively adopt it, permitting the signed and unsigned writings to be read together, provided that they clearly refer to the same subject matter or transaction. See, e. g., Peabody v. Speyers, 56 N.Y. 230; Raubitschek v. Blank, 80 N.Y. 478; Peck v. Vandemark, 99 N.Y. 29, 1 N.E. 41; Coe v. Tough, 116 N.Y. 273, 22 N.E. 550; Delaware Mills v. Carpenter Bros., 235 N.Y. 537, 139 N.E. 725, affg. 200 App.Div. 324, 193 N.Y.S. 201." 110 N.E.2d 553–554.

Levine Huntsville's attempts to distinguish and limit the *Crabtree* decision are unconvincing. Since 1953 the courts of New York, citing *Crabtree* extensively, have allowed litigants to avert the Statute of Frauds with a confluence of memoranda. Clifford v. Carrols New York Development Corp., N.Y.Sup.Ct. 1966, 50 Misc.2d 741, 271 N.Y.S.2d 465; Sorge v. Nott, N.Y.Sup.Ct.1964, 22 A.D. 2d 768, 253 N.Y.S.2d 546; Sokol v. Terry, N.Y.Sup.Ct.1964, 43 Misc.2d 168, 250 N.Y.S.2d 392; Monadnock Cutlery Co. v. Bernard Wasser, Inc., N.Y.Sup.Ct.1962, 35 Misc.2d 162, 232 N.Y.S.2d 196; Schubert v. Bowman, N.Y.Sup.Ct.1957, 9 Misc.2d 111, 167 N.Y.S.2d 451; Torreggiani v. Coffee of Columbia, Inc., Civ.Ct. N.Y.C.1965, 49 Misc.2d 785, 268 N.Y.S. 2d 649. Moreover, such writings need not all be directed from promisor to promisee. Marks v. Cowdin, 1919, 226 N.Y. 138, 145, 123 N.E. 139, 141 (relied on extensively in the *Crabtree* opinion);

Torreggiani v. Coffee of Columbia, Inc., supra.

■ We deem it significant that in opinions which distinguish *Crabtree* and abort contracts because of the lethal thrust of the statute of frauds the courts have emphasized either the total absence of a necessary item of contract, R. D. O'Connell & Assoc. v. Thompson-Starrett Const. Co., N.Y.Sup.Ct.1967, 28 A.D.2d 984, 283 N.Y.S.2d 653, or the lack of *in praesenti* language in the signed instruments, Brause v. Goldman, N.Y.Sup.Ct. 1960, 10 A.D.2d 328, 199 N.Y.S.2d 606, or the preparation by plaintiffs of the unsigned instruments. Brause v. Goldman, supra; Solin Lee Chu v. Ling Sun Chu, N.Y.Sup.Ct.1959, 9 A.D.2d 888, 193 N.Y.S.2d 859. In contrast, in the case at bar the unsigned joint venture instrument covers all essential terms of contract; [10] moreover, the instrument was prepared by Levine Huntsville's counsel.[11] Finally, the letter from "Huntsville Associates" to The Chase Manhattan Bank refers to the joint venture as a *fait accompli*. That letter, which begins, "The undersigned severally represent and agree * * *", is signed by Lawrence Levine along with three officers of Ideal.

The following quote from the *Crabtree* opinion, in turn quoting from the United States Supreme Court, expresses quite well the view that statutes of frauds should not themselves aid and abet in the perpetration of frauds:

"True, the possibility still remains that, by fraud or perjury, an agreement never in fact made may occasionally be enforced under the subject matter or transaction test. It is better to run that risk, though, than to deny enforcement to all agreements, merely because the signed document made no specific mention of the unsigned writing. As the United States Supreme Court declared, in sanctioning the admission of parol evidence to establish the connection between the signed and unsigned writings. 'There may be cases in which it would be a violation of reason and common sense to ignore a reference which derives its significance from such [parol] proof. If there is ground for any doubt in the matter, the general rule should be enforced. But where there is no ground for doubt, its enforcement would aid, instead of discouraging, fraud.' Beckwith v. Talbot, supra, 95 U.S. 289, 292, 24 L.Ed. 496; see also, Raubitschek v. Blank, supra, 80 N.Y. 478; Freeland v. Ritz, 154 Mass. 257, 259, 28 N.E. 226, 12 L.R.A. 561; Gall v. Brashier, 10 Cir., 169 F.2d 704, 708–709, 12 A.L. R.2d 500; 2 Corbin, op. cit. § 512, and cases there cited." 110 N.E.2d 554.

As is pointed out in the above language, the scheduling of trial combat need not suggest the ultimate victor. Rather, it is a recognition that factual questions do exist and that the court should seek out audio as well as visual aids.[12] Generally, on motions for summary judgment courts should not take an astigmatic or myopic view of the facts. Phoenix Savings and Loan, Inc. v. Aetna Casualty & Surety Co., 4 Cir. 1967, 381 F.2d 245, 249; National Screen Service Corp. v. Poster Exchange, Inc., 5 Cir. 1962, 305 F.2d 647, 650–651. And although statutes of frauds do, in fact,

10. Ideal's additional assertion, that the percentage sharing was changed from that originally included in the joint venture agreement, does not affect our determination of the statute of fraud issue. Restatement, Contracts § 223 (1932).

11. In a case quite similar to the one at bar, one New York court indicated that future tense in the only signed document did not usher in the statute of frauds if the unsigned contract had been prepared by the defendant's counsel. Sokol v. Terry, supra. See also Schubert v. Bowman, supra.

12. Ideal has advanced two other attacks on the statute of frauds defense: (1) that a joint venture agreement is not covered by the statute of frauds, and (2) that Ideal's performance under the oral agreement rendered the agreement enforceable. We need not discuss either of these issues in light of our holding on *Crabtree*.

limit the field of inquiry, there are exceptions to their interdictions, which exceptions can lead up to fairness and good faith.

We have examined Ideal's affidavit facts and have concluded that they compel a day in court, to the end that Lawrence Levine's empty chair be viewed in its full factual dimension.

Reversed and remanded.