**WINTHROP LABORATORIES DIVISION OF STERLING DRUG, INC., a corporation, Appellant,**

**v.**

**Clarissa CROCKER, Individually and on Behalf of the Estate of Glenn Crocker, Deceased, et al., Appellees.**

**No. 6308.**

Court of Civil Appeals of Texas, El Paso.

Nov. 21, 1973.

Rehearing Denied Dec. 19, 1973.

851

Rodey, Dickason, Sloan, Akin & Robb, Albuquerque, N. M., Scott, Hulse, Marshall & Feuille, Schuyler B. Marshall, El Paso, for appellant.

Malcolm McGregor, Grambling, Mounce, Deffebach, Sims, Hardie & Galatzan, Morris A. Galatzan, El Paso, for appellees.

## OPINION

OSBORN, Justice.

This is a products liability case involving liability of a drug manufacturer under the Restatement of the Law of Torts, Second, Section 402B. Suit was brought by Clarissa Crocker, Individually and on behalf of the Estate of Glenn E. Crocker, Deceased, against Winthrop Laboratories, Division of Sterling Drug, Inc., and Dr. Eugene Engel, claiming that Mrs. Crocker's husband had become addicted and dependent upon an analgesic medication known as Talwin, which ultimately caused his death. An intervention was filed by the deceased's employer's compensation carrier. The suit against the doctor was settled prior to trial, and the case against the drug company went to the jury for their answers to thirty-eight special issues. Upon their verdict, judgment was entered in the trial Court for Mrs. Crocker. That judgment is reversed and rendered.

The evidence reveals that prior to the events leading up to this lawsuit, the deceased, Glenn E. Crocker, had received medication for arthritis for many years and for diabetes since May, 1967. In June, 1967, Mr. Crocker had an industrial accident while working in a cold storage facility. He received a hernia and it was subsequently determined that he received a severe frostbite to his left thumb and right middle finger. The hernia was surgically repaired in July, 1967, at which time morphine was administered and thereafter Demerol and Darvon were used for post-surgical pain. Subsequently, the condition of his finger and thumb caused his doctor to refer him to an internal medical special-

ist, who hospitalized Mr. Crocker for five days beginning on September 18, 1967, for a thorough evaluation. On September 23, 1967, the referring doctor gave him two prescriptions for Demerol and referred him to an orthopedist. The orthopedist referred Mr. Crocker to a plastic surgeon and the latter hospitalized him for a skin graft on September 28, 1967. At that time, he received Demerol and Talwin. The patient was again hospitalized in October, 1967, for skin graft, at which time both Demerol and Talwin were administered. In November, 1967, Mr. Crocker was hospitalized on two occasions during which time both Demerol and Talwin were again administered to him, and the end of his thumb was amputated.

Mr. Crocker continued to receive prescribed doses of Talwin through December, 1967, January and February, 1968. Two doctors were prescribing Talwin and each attempted to reduce the doses. As it was reduced, Mr. Crocker began to buy Talwin in Juarez, Mexico, since it was available there without prescription. During this time, he also saw Dr. Engel for injections of Demerol. By June, 1968, his wife persuaded him to be hospitalized under the care of another physician for detoxification. He was hospitalized for six days, at which time he slipped out of the hospital and went home. At Mr. Crocker's insistence, his wife called Dr. Engel, who administered a double dose of Demerol on June 10, 1968. Mr. Crocker then went to sleep and died.

The Appellant developed and placed on the market in July, 1967, the pain-killing drug, called Talwin, which was advertised and sold as a non-narcotic drug. Although the advertising literature did not indicate that the use of the drug would not cause physical dependence or addiction, it did indicate that patients with chronic pain who used Talwin for prolonged periods (over 300 days) experienced no withdrawal symptoms even when administration was stopped abruptly. It did indicate that patients dependent on narcotics and receiving

Talwin might experience certain withdrawal symptoms and that in such cases it should be administered with special caution.

The orthopedist testified that he was told by the Appellant's detail man, who had contacted him when Talwin came on the market, that the drug was perfectly harmless and that the doctor could prescribe all he wanted and there would be no physical addictions. This same doctor expressed the opinion at the trial that Mr. Crocker was addicted to Talwin when he was hospitalized in November, 1967, although in his pre-trial deposition he said the deceased was first addicted to Demerol.

The Appellant offered extensive evidence from several witnesses concerning the development and testing of Talwin before it was placed on the market as a prescription drug. The evidence indicated a long recognized need in the medical profession for a strong pain relieving drug which did not have dependence producing properties such as morphine, which was recognized as being highly addictive. In 1960, the Appellant discovered the drug Talwin which was a chemical that had strong pain relieving effects, but apparently without any dependence producing properties. Initially, laboratory tests were performed on animals and subsequently the medication was turned over to the Committee on Drug Addiction and Narcotics, an independent organization composed of members of the National Academy of Science for further testing. The drug was then tested by qualified physicians and by the United States Public Health Service. Subsequently, the National Academy of Science's Committee on Drug Dependence recommended to the U. S. Bureau of Narcotics that Talwin be classified as a non-narcotic drug. This recommendation was accepted and subsequently application was made to the Federal Drug Administration for permission to market the drug. At the time of the application, Talwin had been tested in 17,000 patients with no report of addiction or drug dependency. After the

Federal Drug Administration approved the sale of Talwin to the public it was placed on the market in July, 1967, as a new potent non-narcotic injectable analgesic to relieve pain of all types and degrees in patients with acute and chronic disorders.

By the time of Mr. Crocker's death in June, 1968, the Appellant had sold approximately 34,900,000 doses of the drug and by May 1, 1972, over 800,000,000 doses had been sold. Although the evidence was conflicting as to the number of cases of drug addiction, from the use of Talwin at the time of Mr. Crocker's death, on June 10, 1968, the witnesses for the Appellant acknowledged that at that time they had received four reports of which three were possible dependencies. It was estimated that as of June 10, 1968, three and a half million patients had been treated with Talwin. The proof established that after the death of Mr. Crocker, but prior to the trial of this case, advertising materials had been amended to warn of psychological and physical dependence on Talwin in patients who were emotionally unstable or who had a history of drug abuse.

The jury, in response to special issues submitted to them, made the following findings:

1. That the drug company failed to advise the public during 1967 that Talwin could cause physical dependence.

2. Such failure to advise the public made Talwin unreasonably dangerous.

3. That the drug company represented to the medical profession in 1967 that Talwin would not cause physical dependence.

4. That such representation was relied on by the orthopedic specialist who prescribed it.

5. That the deceased became physically dependent on Talwin.

6. The sum of $33,000 in damages for conscious pain and suffering by Mr. Crocker prior to his death as a result of his dependency on Talwin.

7. That the deceased's physical dependence on Talwin was a producing cause of his death.

8. The sum of $113,870 in damages to the widow for her pecuniary loss, resulting from the death of her husband.

9. That Crocker's addiction or dependency on Talwin was an abreaction.

10. That at the time in question, the state of medical knowledge was such that the drug company could not reasonably have foreseen that Talwin would cause addiction in an appreciable number of persons.

11. That by January, 1968, Crocker did not know of the risk of addiction to Talwin.

14. That Crocker was not negligent in securing and taking Talwin without a doctor's prescription between January and June, 1968.

16. That Crocker was negligent in securing and taking Talwin and other medicines from different doctors without advising such doctors of his prior use of such drugs; and (17) That this was a proximate cause of his death.

18. That Crocker was negligent in discontinuing his withdrawal medical treatment; and (19) This was a proximate cause of his death.

20. That Crocker was not negligent in continuing to take Talwin against the advice of his treating physician after January, 1968.

22. That Crocker was not negligent in demanding and receiving an injection of Demerol on the night of his death.

24. That Crocker was not negligent in taking injections of Demerol at least once a week from December, 1967, to June 10, 1968.

26. That Crocker first became an addict as a result of taking a drug other than Talwin; but (27) Failed to find that this addiction continued until the death of Crocker.

28. That Mrs. Crocker was not negligent in failing to have Crocker hospitalized during the day of his death.

30. That Mrs. Crocker failed to inform Dr. Engel that Crocker had been undergoing withdrawal treatment; but (31) That this was not negligence.

33. That Crocker died as a proximate result of a heart attack; but (33-A) Failed to find that the heart attack was not proximately caused by Crocker's use of Talwin.

34. That Dr. Engel was not negligent in giving Crocker the Demerol injection just prior to his death.

36. That Dr. Engel failed to advise Mrs. Crocker to hospitalize her husband the night of his death; (37) That such was negligence; and (38) A proximate cause of Crocker's death.

The Appellee contends that the jury findings entitled her to a judgment under the provisions of Section 402B of the Restatement of Torts, Second. That section provides:

"One engaged in the business of selling chattels who, by advertising, labels, or otherwise, makes to the public a misrepresentation of a material fact concerning the character or quality of a chattel sold by him is subject to liability for physical harm to a consumer of the chattel caused by justifiable reliance upon the misrepresentation, even though

(a) it is not made fraudulently or negligently, and

(b) the consumer has not bought the chattel from or entered into any contractual relation with the seller."

The Appellant asserts fifteen points of error. The first point complains of the trial Court's entry of judgment against it, after the jury found in answer to Special Issue No. 9, that Mr. Crocker's dependence or addiction was an abreaction. The second point complains of the trial Court's entry of judgment against it, after the jury found in answer to Special Issue No. 10, that during the time Mr. Crocker was taking Talwin under his doctors' prescription, the state of medical knowledge was such that Appellant could not have reasonably foreseen, in the exercise of ordinary care, that Talwin would cause an addiction in an appreciable number of persons.

The Courts of this State have readily adopted and applied the provisions of Section 402A of Restatement, Second, Torts, in order to provide strict liability in tort. Shamrock Fuel & Oil Sales Co., Inc. v. Tunks, 416 S.W.2d 779 (Tex.Sup.1967); McKisson v. Sales Affiliates, Inc., 416 S.W.2d 787 (Tex.Sup.1967).

Indeed, long before Section 402A came into existence, Texas had adopted a rule of strict liability, based upon public policy, against manufacturers and retailers of food products intended for human consumption. Jacob E. Decker & Sons, Inc. v. Capps, 139 Tex. 609, 164 S.W.2d 828 (1942); Griggs Canning Co. v. Josey, 139 Tex. 623, 164 S.W.2d 835 (1942). The rule was subsequently extended to products sold for consumption by animals. International Milling Co. v. Jernigan, 191 S.W.2d 526 (Tex.Civ.App.—Waco 1945, no writ); McMillen Feeds, Inc. of Texas v. Harlow, 405 S.W.2d 123 (Tex.Civ.App.—Austin, 1966, writ ref'd n. r. e.). But prior to the adoption of § 402A the rule had been limited in cases involving a wholesaler. Bowman Biscuit Co. of Texas v. Hines, 151 Tex. 370, 251 S.W.2d 153 (1952).

The Courts of this State have dealt sparingly with the provisions of § 402B. In Jack Roach-Bissonnet, Inc. v. Puskar, 417 S.W.2d 262 (Tex.Sup.1967), and in Ford Motor Company v. Russell & Smith Ford Company, 474 S.W.2d 549 (Tex.Civ.App. —Houston (14th Dist.) 1971, no writ), the Court did not reject the misrepresentation section, but only concluded that the proof did not make out a case under § 402B. In Franks v. National Dairy Products Corporation, 282 F.Supp. 528 (W.D.Tex.1968), the Court held that there was no reliance upon any implied representation that the product could be used safely because the plaintiff testified that he did not rely upon the manfuacturer's brochure or any other writing. In neither of those cases did the Court expressly reject § 402B, but in each instance the Court concluded that the proof was not such as to come within the provisions of that particular section of the Restatement, Second, Torts. For purposes of this appeal and until the Texas Supreme Court asserts otherwise, we recognize § 402B as the applicable law of this State. That Court had no reluctance to adopt § 402A, and we see no reason to doubt the adoption of § 402B under a proper set of facts, particularly where the product is sold for human consumption.

 But under the doctrine of strict liability, as set forth in § 402A, the manufacturer is not an insurer of its product. Shamrock Fuel & Oil Sales Co., Inc. v. Tunks, supra. There is still the requirement of proof of a defective product which is reasonably dangerous. Metal Window Products Co. v. Magnusen, 485 S.W.2d 355 (Tex.Civ.App.—Houston (14th Dist.) 1972, writ ref'd n. r. e.). And there must be a causal relationship between the defect and injury. Technical Chemical Company v. Jacobs, 480 S.W.2d 602 (Tex.Sup.1972). The defendant is not liable for a misuse of the product, McDevitt v. Standard Oil Company of Texas, 391 F.2d 364 (5th Cir. 1968); nor for assumption of risk in the use of the product after the consumer or user knows of the defect. Shamrock Fuel

& Oil Sales Co., Inc. v. Tunks, supra. Basically, strict liability avoids the necessity of proving a failure on the part of the seller to exercise ordinary care (negligence), and there need be no showing of a contractual relationship between the seller and the user or consumer as is required in the usual warranty case.

 In this case there was neither pleading nor proof that the drug was an impure or contaminated product, and there was no finding that the drug was defective or unfit but only that it was unreasonably dangerous. The liability must ultimately turn upon the jury findings of representation (Special Issue No. 3); reliance (Special Issue No. 4); the drug addiction (Special Issue No. 5); and the producing cause of death (Special Issue No. 7), all of which were answered favorably to the Appellee, and the findings of abreaction (Special Issue No. 9) and on state of the art (Special Issue No. 10), both of which were answered favorably to the Appellant. We believe that the findings in favor of the Appellee made out a prima facie case under § 402B. The jury found that there was a representation that Talwin would not cause physical dependence (Special Issue No. 3) and that the deceased did in fact become physically dependent upon Talwin (Special Issue No. 5). Thus, there was a misrepresentation of a material fact concerning the character or quality of the drug sold by the Appellant. The jury also found a reliance by one of the prescribing doctors upon the oral representation of Appellant's detail man (Special Issue No. 4). As noted in § 402B, Comment j., the reliance need not necessarily be that of the consumer who is injured, and in prescription drug cases, the reliance quite normally would be that of the prescribing doctor. Thus, the jury found all of the essential elements of liability to make out a prima facie case in favor of the Appellee.

It therefore becomes necessary to consider and determine the effect of the jury's answers to Special Issues Nos. 9 and 10.

Those issues and' the instructions with them are as follows:

## "SPECIAL ISSUE NO. 9

Do you find, from a preponderance of the evidence, that Glenn E. Crocker's addiction or dependency upon Talwin, if any, was an abreaction?

'Abreaction' means an unusual reaction resulting from a person's unusual susceptibility to the product or intended effect of the product in question; that is, such person's reaction is different in the presence of the drug in question from that in the usual person. An abreaction is one in which an unusual result is produced by a known or theoretical mechanism of action. An abreaction is one which could not have been reasonably foreseen in an appreciable class or number of potential users prior to the time Glenn E. Crocker became addicted or dependent on Talwin, if you have found that he was addicted or dependent on Talwin.

Answer 'yes' or 'no'.

WE ANSWER: Yes

## SPECIAL ISSUE NO. 10

Do you find, from a preponderance of the evidence, that at the time Glenn E. Crocker was taking Talwin under doctors' prescription, the state of medical knowledge was such that Winthrop Laboratories could not reasonably have foreseen, in the exercise of ordinary care, that Talwin would cause an addiction in an appreciable number of persons?

Answer: 'We find that such addiction could have reasonably been foreseen in an appreciable number of persons,'
 or
'We find that such addiction could not have reasonably been foreseen in an appreciable number of persons.'

WE ANSWER: We find that such addiction could not have reasonably

been foreseen in an appreciable number of persons".

The definition of abreaction under Special Issue No. 9 was patterned after the definition given in Cudmore v. Richardson-Merrell, Inc., 398 S.W.2d 640 (Tex. Civ.App.—Dallas 1965, writ ref'd n. r. e., cert. denied 385 U.S. 1003, 87 S.Ct. 705, 17 L.Ed.2d 542). Special Issue No. 10 apparently was patterned after a similar issue in the Cudmore Case, which raised the "state of the art" defense. Both issues obviously include the element of foreseeability, which element was expressly excluded in the instruction accompanying Special Issue No. 2, and it was not included in the definition of producing cause.

■ These findings resolve themselves into an issue of whether foreseeability is an element of a defensive or inferential-rebuttal issue under § 402B as it is under § 402A, where there is a pure, unadulterated product involved. Note, 21 Sw.L.J. 678 (1967). We conclude that it is. In the Cudmore Case, the Court held that if the manufacturer is not an insurer, then in those cases involving a pure, unadulterated drug, the manufacturer should be liable "for injurious results only when such results or some similar results ought reasonably to have been foreseen by a person of ordinary care in an appreciable number of persons in the light of the attending circumstances." The finding of an unforeseen reaction removes a party from such class of persons and the manufacturer from liability in a pure drug case. C. A. Hoover and Son v. O. M. Franklin Serum Company, 444 S.W.2d 596 (Tex.Sup.1969).

A similar result was reached as a matter of law in Alberto-Culver Company v. Morgan, 444 S.W.2d 770 (Tex.Civ.App.—Beaumont 1969, writ ref'd n. r. e.), in spite of a jury finding that the injuries were not an abreaction. The Court in that case said:

"Appellant owed no duty to Mrs. Morgan to warn her of the dangerous effects of using New Dawn, because there is no

evidence that she belonged to an appreciable class or number of potential users of New Dawn the manufacturer could reasonably have foreseen would have received injuries by the use thereof."

In Carmichael v. Reitz, 17 Cal.App.3d 958, 95 Cal.Rptr. 381 (1971), the Court considered a case involving the liability of both a drug manufacturer, druggist, and prescribing doctor, where the evidence raised an issue as to whether the injuries "were not the result of an allergy or peculiar sensitivity common only to an insubstantial percentage of the population." In discussing the duty of the manufacturer, the Court said:

"In absence of a showing that the manufacturer knew or should have known by reasonable 'developed human skill and foresight' that the drug is dangerous the court in *Oakes* stated that 'to exact an obligation to warn the user of unknown and unknowable allergies, sensitivities and idiosyncracies would be for the courts to recast the manufacturer in the role of an insurer.' (272 Cal.App.2d at p. 651, 77 Cal.Rptr. at p. 713.) * * * But whether the drug in question is a proprietary drug (available without prescription) or an ethical drug (available only upon prescription), the matters concerning allergies, hypersensitivities, and physical idiosyncracies of the ultimate user, which raise many difficult problems (see Prosser, op. cit., at pp. 668–669), should be treated as just another factor in the issues of 'duty to warn, duty to know, and duty to test' (Rheingold, (1964) 18 Rutgers L.Rev. 947, 1005). (See also: 3 Frumer and Friedman, Products Liability (1970) § 33.02(4).)"

In the Hoover Case, the Court concluded that the manufacturer was liable because the unfit drug which precipitated harm (producing cause) was unreasonably dangerous, and since such harm was not an unforeseeable reaction to the user. In the case now before us, since the jury found the harm could not have been reasonably foreseen in an appreciable number of persons, and since the drug was not unreasonably dangerous to the ordinary user, there should be no liability on the part of the manufacturer.

This result is based upon sound reasoning. As noted by Dean Prosser in his much cited article: "The Assault Upon the Citadel," 69 Yale L.Rev. 1099 (1960), at page 1144:

"It is clear initially that the seller is entitled to expect a normal use of his product, and that he is not to be held liable when it is mishandled or used in some unusual and unforeseeable way, * * *.

* * * * * *

Again, it is clear that the seller may expect, within some reasonable limits, that the product will be used by normal persons, and that he will not be held responsible when some idiosyncracy peculiar to the plaintiff makes him abnormally sensitive to a product quite harmless to ordinary people."

Similarly, Dean Page Keeton, in discussing the liability of a drug manufacturer, has written:

"Neither the *Second Restatement* nor the *Uniform Commercial Code* would allow recovery by the allergic user, and economic loss-spreading arguments do not necessarily support such recovery. A number of other factors argue against recovery by the so-called allergic victim. Recovery only for true allergies involves making a distinction between an idiosyncratic sensitivity, an allergic reaction, and perhaps even just a predisposition of some kind to an injury. Lung cancer from cigarettes, for example, is perhaps not, medically speaking, an allergic reaction, and alcoholism is perhaps not the result of an allergy. Although distinguishing between allergic and idiosyncratic re-

actions for purposes of 'risk spreading' is theoretically sound, basing liability on such a distinction involves complicated factual findings similar to those required by independent judicial examination of the factual data underlying FDA approval. Unless recovery is to be allowed in every case in which injury results from a product used appropriately, the practical difficulties of making the necessary distinctions should probably prevent allergic victims from recovering." "Some Observations About the Strict Liability of the Maker of Prescription Drugs: The Aftermath of MER/29," 56 Calif.L. Rev. 149, 156–157 (1968).

More recently, Professor Merrill, in an article entitled: "Compensation for Prescription Drug Injuries," in 59 Va.L.Rev. 1 (1973), says:

"However, neither court decisions nor the *Restatement's* 'strict liability' section requires that he (a manufacturer) take more than 'reasonable precautions.' A manufacturer who properly designs and manufactures his product, complies with FDA requirements for drug testing, and takes reasonable steps to warn physicians about the *known* or *discoverable dangers* of his drug will not be liable for the injuries that it inevitably inflicts." 59 Va.L.Rev. 1, 37. (Emphasis added.)

"Since the physician usually decides whether a drug shall be prescribed, a warning to physicians is ordinarily all that is required; the manufacturer need make no effort to communicate with the consumer himself. The case law supports two additional propositions: first, a manufacturer is under no duty to warn of adverse reactions he did not or could not foresee, and second, he can avoid liability to users by warning physicians about reactions that he could foresee.

\* \* \* In Texas, for example, a manufacturer must warn about a foreseeable reaction only when it threatens 'an appreciable number of persons.'" 59 Va.L.Rev. 1, 39.

The conclusion reached by these writers finds substantial support in the cases which have considered the question of foreseeability as applied in similar cases. Esborg v. Bailey Drug Company, 61 Wash.2d 347, 378 P.2d 298 (1963); Howard v. Avon Products, Inc., 155 Colo. 444, 395 P.2d 1007 (1964); Magee v. Wyeth Laboratories, Inc., 214 Cal.App.2d 340, 29 Cal.Rptr. 322 (1963); Merrill v. Beaute Vues Corporation, 235 F.2d 893 (10th Cir. 1956); Lartigue v. R. J. Reynolds Tobacco Company, 317 F.2d 19 (5th Cir. 1963); Ross v. Philip Morris & Company, Ltd., 328 F.2d 3 (8th Cir. 1964); O'Hare v. Merck & Company, Inc., 381 F.2d 286 (8th Cir. 1967); Robbins v. Alberto-Culver Co., 210 Kan. 147, 499 P.2d 1080 (1972); Borel v. Fibreboard Paper Products Corporation, No. 72–1492, September 10, 1973 (5th Cir. 1973). In this last cited case, the Court pointed out that the requirement that the danger be reasonably foreseeable, or scientifically discoverable, is an important limitation of the seller's liability.

In C. A. Hoover and Son v. O. M. Franklin Serum Company, supra, the Court considered the question of foreseeability since that issue was raised in the definition of abreaction as used in the trial Court's charge but excluded in the definition of producing cause. The Court said:

"It is said that foreseeability becomes significant in product liability cases when the product is what it is intended and known to be, but injury is suffered because the product is misused or because of some unknown or abnormal reaction in the consumer.

\* \* \* \* \* \*

It is this unforeseen reaction which saved the defendant from liability in Cudmore."

Of course, it is clear that where a food product or drug is defective or unfit, because it is contaminated, or impure, or there is an adulteration of the product, the issue of foreseeability is removed and liability will not turn on the manufacturer's knowledge or lack of knowledge of danger

from the use thereof and the Court will hold as a matter of law that one who markets such a product should foresee the likelihood of injury to the consumer of the product. Griggs Canning Co. v. Josey, supra; Burrus Feed Mills, Inc. v. Reeder, 391 S.W.2d 121 (Tex.Civ.App.—Amarillo 1965, no writ); C. A. Hoover and Son v. O. M. Franklin Serum Company, supra.

At the time the Appellant first placed Talwin on the market it was in much the same position as the drug company initially was in, in Davis v. Wyeth Laboratories, Inc., 399 F.2d 121 (9th Cir. 1968). In discussing that initial duty, the Court said:

> "When Type III Sabin vaccine was first licensed by the Government in early 1962 and first manufactured and sold by Wyeth, there was no known or foreseeable risk involved in taking it. Thus Wyeth could not initially be expected to warn of unknown dangers."

After there is some marketing and use of a drug, results of such use may change the duty of the manufacturer, particularly with regard to the duty to warn. In Basko v. Sterling Drug, Inc., 416 F.2d 417 (2nd Cir. 1969), the Court discussed this changing duty and said:

> "As we indicated earlier, there is no duty to warn of unknown or unforeseeable risks. Dates are thus vitally important, since the duty to warn depends on when the risk became apparent. According to the records kept by Yale-New Haven Hospital, plaintiff took Aralen from April, 1953 to January, 1957. Defendant did not warn of the risk of idiosyncratic reaction until 1960. Thus, the only real question with respect to Aralen is whether the risk was either knowable or reasonably foreseeable at a time when plaintiff was still taking the drug. On the facts of this case, this was properly a jury question."

The real problem involved on the issue of foreseeability is discussed at length by Dean Keeton in his article, "Products Liability—Drugs and Cosmetics," 25 Vand.L. Rev. 131, 142 (1972), and the end result of the above two cases is noted as follows:

> "Therefore, both *Basko* and *Wyeth* support the proposition that a manufacturer is not liable for harm resulting from a good product until after the manufacturer knew or should have known of the risk of harm and failed to give adequate warning."

This duty to warn has been discussed by Professor Noel in his article, "Defective Products: Abnormal Use, Contributory Negligence, and Assumption of Risk," 25 Vand.L.Rev. 93 (1972), at page 104, where he states:

> "The duty to warn allergic users may arise in breach of warranty, on negligence grounds, or under strict tort liability. The duty does not arise with reference to the common allergies such as those to milk or citrus fruits, for which the harm is trivial, and the risk ordinarily is known to the susceptible person. Even for serious allergic reactions from chemical sensitizers about which the plaintiff has never heard, the duty to warn does not extend to isolated users, but only to a plaintiff who is found to be a member of an appreciable group. The problem is to determine when the court will regard the plaintiff as a member of an appreciable, substantial, or significant group. In making that determination, the more recent decisions consider not only the percentage of users affected, but also the gravity of foreseeable injuries and the difficulty of embodying effective protection in labels or the like. The size of the class needed before a duty to warn arises, assuming an injury of given seriousness, is declining, but there still are many recent cases in which a duty to warn has not been established because the plaintiff is regarded as a more or less isolated user."

And where the jury has found, as in this case, that the state of medical knowledge was not such that Appellant could reasona-

bly have foreseen the addiction caused by the use of Talwin there would be no way to give any reasonable, meaningful warning. As stated in Christofferson v. Kaiser Foundation Hospitals, 15 Cal.App.3d 75, 92 Cal.Rptr. 825 (1971), in a case involving the duty to warn concerning a drug sold under the name Aralen:

"To require him to compose a warning of side effects not suggested by careful laboratory procedures such as preceded distribution of Aralen would seem to require either a semantically impossible sort of warning or one which would effectively bar the very experience which alone could give early hint of side effects of a new product extremely valuable in many cases of specific illnesses."

Unfortunately for the Appellee in this case, the jury found both, that the state of medical knowledge was such that the Appellant could not have reasonably foreseen the resulting addiction in an appreciable number of persons (Special Issue No. 10), and that the dependency on Talwin was an abreaction which could not have been reasonably foreseen in an appreciable number of potential users (Special Issue No. 9).

█ This does not mean that a manufacturer of drugs is automatically relieved of liability in all cases where the injury results from an adverse reaction or some personal idiosyncrasy of the consumer. If the manufacturer knows, or as an expert in its particular field, by the application of reasonable, developed human skill and foresight, should have known of an appreciable class of people who would be subject to an adverse reaction by the use of its product, it must give adequate warning in order for there to be an intelligent choice as to whether to use the product or not, or the manufacturer will be liable for the resulting injury and damages therefrom. "Products Defective Because of Inadequate Directions or Warnings," Dix W. Noel, 23 Sw.L.J. 256, 296–297 (1969). In this case, the jury found that the deceased was not in such an appreciable class of persons.

Of course, what is an "appreciable class" is one which has received little attention from the Courts. In Davis v. Wyeth Laboratories, Inc., supra, the Court suggested that even one in a million would require a warning, whereas, in Bennett v. Pilot Products Co., Inc., 120 Utah 474, 235 P.2d 525 (1951), the Court concluded that there was no duty to warn where a permanent wave lotion would produce an allergic reaction in one in a thousand users. These and other cases are reviewed by Professor Noel in the aforementioned Article in 23 Sw.L.J. 256, 291–297. In this case, the issue was submitted to the jury and the Appellee having unqualifiedly moved for judgment upon the verdict, she cannot now complain of the jury finding against her, but is bound by those findings, which entitle the Appellant to a judgment in this case. Braswell v. Braswell, 476 S.W.2d 444 (Tex.Civ.App.—Waco 1972, writ dism'd); Wilson v. Burleson, 358 S.W.2d 751 (Tex.Civ.App.—Waco 1962, writ ref'd n. r. e.).

The Appellant's first two points of error are sustained. It therefore becomes unnecessary to determine the other points of error. The judgment of the trial Court is reversed and judgment rendered for the Appellant.